WILLIAM A. CULPEPPER, Judge Pro Tem.
Defendant, Kenneth Prestridge, was charged by a Rapides Parish grand jury on June 5, 1984 with first degree murder in violation of La.R.S. 14:30. On June 1, 1985, a twelve person jury unanimously found the defendant guilty as charged. On June 6, 1985, after a sentencing hearing, the jury unanimously recommended that the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence and, on September 6,1985, the court sentenced the defendant according to the jury’s recommendation. Defendant now appeals his conviction.
FACTS
On May 12, 1984, the victim, Sophia Ara-gon, a sixteen year old white girl, met the defendant, a twenty year old white youth, and his friend, John Paul Trichel, and John’s girlfriend at a local gameroom. The four spent most of the afternoon together riding in defendant’s car, finally arriving at John’s house. John and his girlfriend left the house for approximately 30 minutes, leaving the defendant and the victim together in the house. After John and his girlfriend returned to the house, John noticed that defendant seemed upset.
Defendant and the victim left the house in defendant’s car at approximately 9:00 P.M. He returned to the house alone at approximately 10:30 P.M., where John and his girlfriend were waiting. Shortly thereafter, defendant stated to John that he had killed the victim. John, believing the defendant to be joking, did not immediately notify law enforcement officials. Two days later, on May 14, 1984, John and his mother contacted his attorney who telephoned the Pineville City Police and discov *1273 ered that a missing persons report had been issued for the victim. John’s attorney then called the Rapides Parish Sheriff’s office, and the victim’s body was found shortly thereafter at the location where defendant told John he had killed the victim.
Defendant was arrested and taken into custody on May 14, 1984 and gave an oral taped statement at the Rapides Parish Sheriff’s Department. During his statement he admitted that he had killed the victim after having sex with her in his car. Defendant stated that the victim had consented to sex before she was murdered; however, evidence introduced at trial, including the testimony of defendant’s friend, clothing samples from defendant’s car with tears indicating that the victim’s clothing was removed forcibly, and the condition of the victim’s body, caused the jury to find that the victim did not consent to sex with the defendant and that the defendant raped the victim prior to murdering her.
The issue of whether there was sufficient evidence from which the jury could have found beyond a reasonable doubt that the defendant committed rape and murder and, therefore, first degree murder on the victim (Assignment of Error Number 6), although contested in defendant’s original brief on appeal, is no longer contested and is abandoned, along with two of defendant’s other original assignments of error on appeal (Assignments of Error Numbers 1 and 5). We, therefore, address only defendant’s Assignments of Error Numbers 2, 3 and 4, which are not abandoned.
MOTION TO CHANGE VENUE
In assignment of error number two defendant contends the trial court erred in denying his motions for change of venue based on the amount and nature of pretrial publicity which allegedly made it impossible for the defendant to receive a fair trial in Rapides Parish.
Defendant’s counsel filed a motion for change of venue, which motion was heard and denied on August 9, 1984. The basis of defendant’s motion was the publication of several allegedly prejudicial newspaper articles in a local newspaper and the broadcasting of several news articles containing allegedly prejudicial allegations of fact. On May 27, 1985, after completion of the jury selection process and following an evi-dentiary hearing on the matter, the trial court denied a supplemental motion for change of venue filed by defense counsel.
La.C.Cr.P. art. 622 specifically provides for grounds for change of venue as follows:
“A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.”
According to this article the defendant is burdened with proving, even though it would be possible to select a jury whose members were not subject to challenge for cause, that such prejudices exist in the community which would affect the answers of jurors on the voir dire or the testimony of witnesses at trial, or that for any other reason a fair and impartial trial could not be obtained in the parish. LSA-C.Cr.P.art. 622; State v. Neslo, 433 So.2d 73 (La.1983); State v. Bell, 315 So.2d 307 (La.1975), appeal after remand, 346 So.2d 1090 (La.1977). In determining whether a defendant has satisfied this burden, the trial court possesses a broad range of discretion. State v. Rodrigue, 409 So.2d 556 (La.1982), appeal after remand, 437 So.2d 830 (La.1983). Nevertheless, we are required to make an independent evaluation of the circumstances surrounding defendant’s trial to determine whether he was entitled to have his case transferred to another venue. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); State v. Rodrigue, supra.
*1274 Prior jurisprudence indicates that factors used in considering a motion for change of venue include the following:
(1) The nature of pretrial publicity and the degree to which it has circulated;
(2) The connection of government officials with the release of the publicity;
(3) The length of time between the dissemination of the publicity and the trial;
(4) The severity and notoriety of the offense;
(5) The area from which the jury is to be drawn;
(6) Other events occurring in the community and affecting or reflecting the attitude of prospective jurors;
(7) Factors likely to affect the candor and veracity in areas to which venue could be changed;
(8) The degree to which publicity has circulated in areas to which venue could be changed;
(9) The care exercised and ease encountered in jury selection;
(10) Familiarity with publicity and its resultant effect on jurors; and
(11) Peremptory challenges for cause exercised by the defendant.
State v. Willie, 410 So.2d 1019 (La.1982), appeal after remand, 436 So.2d 553 (La.1983), cert. den., 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984); State v. Bell, supra; State v. Rodrigue, supra.
News coverage of the case at hand was fairly extensive. During the time from one day after the discovery of the victim’s body until the hearing on defendant’s supplemental motion for change of venue on May 27, 1985, more than one year after the murder, approximately fifteen newspaper articles concerning the case were printed by local newspapers, the Alexandria Daily Town Talk and the Red River Journal. The managing editor of the Alexandria Daily Town Talk testified at the first venue hearing that 40-45% of the circulation of the paper was localized in Rapides Parish. Also, several articles concerning the incident were broadcast by local radio and television stations.
Factual news coverage of the incident was necessarily graphic, several of the articles discussing how the victim was beaten and her body found hanging in a tree from a hangman’s noose in a wooded area. One of the newspaper articles stated that the victim’s body was found nude. Several of the articles narrated the arraignment, a closed hearing and the jury selection process in the case. As the trial judge noted concerning defendant’s supplemental motion for change of venue, some of the articles contained some potentially inflammatory coverage, including an interview with the victim’s family, mention of a confession and views expressed by some of the judges on closed hearings in the matter. However, the news coverage was factual and relatively objective.
Although the local sheriff’s office gave a factual account of the incident to the press prior to implementation of a news blackout ordered by the district court, there is no indication of substantial government involvement with the release of publicity in the incident.
The length of time between the dissemination of most of the publicity and the trial was approximately one year, and likely the passions of the community had subsided somewhat during this time. Several articles concerning the selection of jurors and the commencement of trial were published shortly before commencement of trial. There were also references made to a document filed by the district attorney’s office concerning their theory of the case and to reports of jury tampering in news articles published shortly before trial. However, as noted by the trial judge in his reasons for decision concerning denial of defendant’s supplemental motion for change of venue, the majority of the publicity during voir dire selection and prior to trial was factual in nature.
The severity and notoriety of the offense is considerable, as the defendant was charged with first degree murder in the rape and murder of a teenager. The area from which the jury was to be drawn was described by the trial judge as follows:
“The area from which the jury is drawn consists of all the registered vot *1275 ers in Rapides Parish, which is the fifth largest parish in Louisiana in terms of size and area, and is among the ten most highly populated parishes in the state. Thus, a large base existed from which the prospective jurors were drawn.”
An event in the community which may have affected the attitude of the community toward the defendant, and which was mentioned by the trial judge and the defendant, was the slaying of a young girl occurring one year before the murder of the victim in the instant case. The trial court remarked that the only connection between that case, the Brown case and the instant case was overlapping publicity and that, as far as the court could recall, no prospective jurors were questioned about the Brown case.[1] Furthermore, our review of the trial court record does not show any further affect of the Brown case on the attitude of the community toward the defendant. We also note an absence in the instant case of such inflammatory factors as the killing of law enforcement officers and live press coverage of the defendant’s arrest. See State v. Bell, supra; State v. Rodrigue, supra.
Other than the pretrial publicity discussed above, the record does not reflect the existence of other factors likely to affect the candor and veracity of the prospective jurors. The record does not indicate that the prospective jurors were less than honest in their responses concerning publicity. There is no evidence in the record of the degree to which the publicity has circulated in areas to which venue could be changed. The care exercised in selection of the jury was considerable. Six weeks were spent on jury selection. While the record indicates that many prospective jurors were aware of publicity concerning the case, it should be noted that the defendant did not exercise all of his peremptory challenges.[2]
An analysis of the factors discussed above as well as the trial judge’s reasons for decision reveal that the pretrial publicity did not adversely affect jury selection. The trial judge described the jury selection process as follows:
“A total of approximately 175 prospective jurors, out of 450 summons were questioned on voir dire by the attorneys and the Court. Only about 10 of the 175 were excusable for cause due to a fixed opinion resulting from publicity, and an additional five or six out of the initial 450 were previously excused due to a fixed opinion resulting from pretrial publicity. There is nothing to indicate that the jurors were other than candid in their responses. Furthermore, the defendant exercised his privilege of challenging only 11 of the prospective jurors peremptorily, thus failing to exhaust all of his peremptory challenges. Each of the 175 prospective jurors were questioned individually out of the presence of any of the other prospective jurors, thus assuring more candid responses and insulating them from publicity.
Although a majority of the jurors were exposed to and were aware of the crime, they did not, as evidenced by the voir dire examination, remember reports of highly significant information, such as the existence [sic] or contents of a confession, or substantial amounts of inflammatory material which would make them subject to a challenge for cause without regard to the prospective juror testimony as to state of mind. There was also no proof that the state of the public mind against the defendant is such that jurors did not completely answer honestly upon their voir dire, or that witnesses would be so affected by the public atmosphere that they would not testify freely and frankly.
In summary the Court is compelled to observe that the possible effects of potentially inflammatory pretrial publicity *1276 simply did not materialize during voir dire examination of the prospective jurors, and this was especially true with respect to the Tales jurors, among whom there was indication of even less damaging effect of any pretrial publicity. Apparently, any effects of the pretrial publicity had become attenuated by the time these jurors were selected.” (Emphasis added.)
Although publicity concerning the instant case was fairly extensive, we are convinced that the trial court did not err in denying defendant’s motions for change of venue, and in finding that the defendant was unsuccessful in proving that he was unable to obtain a fair and impartial trial in Rapides Parish.
Defendant contends on appeal that the recent treatment by our Supreme Court of the Brown case, discussed supra, is persuasive. See State v. Brown, 496 So.2d 261 (La.1986). While in Brown the court found that the press coverage and notoriety of the Brown case when combined with the outrage in the local community over the life sentence in the instant case had a cumulative effect of depriving the defendant in Brown of a fair and impartial trial, we do not find the reverse to be true. Media coverage of the Brown case was more extensive than coverage of the instant case, and the court in Brown specifically pointed out that it was the community reaction to the life sentence in the instant case, not the overall overlapping publicity of the two cases, which was significant in the court’s decision. See State v. Brown, at 263. The court in Brown also found additional grounds on which to support its reversal of the defendant’s conviction and sentence.
We find no merit in assignment of error number 2.
EXCLUSION OF “NON-DEATH QUALIFIED” JURORS
In assignments of error numbers 3 and 4, defendant assigns as error the trial court’s denial of his motion to exclude a “death qualified” jury and the trial court’s excusal of individual jurors for cause during the guilt/innocence phase based on their opposition to capital punishment.
Prior to commencement of trial, defendant filed a motion to exclude a “death qualified” jury at the guilt/innocence phase of trial. The basis of defendant’s motion was that La.C.Cr.P. art. 798(2), which allows the State to challenge for cause any juror in a capital case who either would automatically vote against imposing capital punishment or whose “attitude toward the death penalty” would prevent him from making an impartial decision as to a defendant’s guilt, is unconstitutional.[3] Defendant contends that under our State’s bifurcated trial system the selection of only “death qualified” jurors at the guilt/innocence phase of a capital trial denies defendant’s constitutional right to a fair and impartial jury because: (1) death qualified jurors are more prone to convict than non-death qualified jurors, and (2) death qualified juries result in unconstitutional exclusion of a disproportionate number of blacks.
A defendant’s right to a fair trial is guaranteed under our State and Federal Constitutions. See The Constitution of the United States, Sixth and Fourteenth Amendments; LSA-Const. of 1974, Art. I, § 16.
During the hearing on defendant’s motion to exclude “death qualifying” jurors at the guilt/innocence phase of the trial, the defendant presented Dr. James Hayes, who was admitted as an expert in clinical and forensic psychology, and Dr. Yvonne Osborne, who was admitted as an expert in psychology with expertise in jury behavior. Dr. Hayes testified that he conducted a *1277 media research study by reviewing published research articles on the issue of death qualified juries at the guilt/innocence phase of trial. The trial court summarized the testimony of Dr. Hayes and Dr. Osborne as follows:
“[B]ased on his reviews, Dr. Hayes concluded first that persons who favor capital punishment are more prone to convict and that those who oppose capital punishment are more prone to acquit. He further concluded that persons excluded from juries under the Witherspoon guidelines [Witherspoon v. State of Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ] represent an identifiable group in a community that is characterized by its distinctive attitude toward the death penalty. Further, Dr. Hayes concludes the exclusion of this group results, (1) in juries from which blacks are disproportionately excluded and (2) in juries that are more prone to convict. These are called ‘death qualified’ juries as they qualify to consider the death penalty under Witherspoon.
Dr. Osborne conducted a telephone survey of residents of Rapides Parish, Louisiana. The survey was conducted by random calls to persons listed in the 1984 Alexandria telephone directory, which in addition to that city covers the towns of Ball, Deville, Pineville, Boyce and Le-compte. Areas in Rapides Parish not covered by the telephone directory include the towns of Cheneyville, Glenmora and other communities in the southern and western areas of the Parish. The persons contacted were read a survey questionnaire and their responses were recorded by checking appropriate spaces on the questionnaire form. Of the almost 500 questionnaires collected 346 were deemed to be usable and Dr. Osborne testified that this sample was sufficient in size to make some predictions about the population in Rapides Parish. Dr. Osborne divided those surveyed into two groups; (1) death qualified (DQ), that is those qualified to serve as jurors under Witherspoon, and (2) Witherspoon Excludables (WEs), those who would be excluded under Witherspoon.
The WEs were then broken down into two groups, (a) Guilt Phase Indudables (GPIs), that is those who could not return a penalty of death under any circumstance but who could nevertheless render a fair and impartial verdict on the question of guilt or innocence; and (b) Nullifi-ers (NULL), being those whose opposition to the death penalty would prevent them from rendering a fair verdict on the question of guilt or innocence.
Of the 346 usable surveys, Dr. Osborne concluded that 295 were Death Qualified and 51 were Witherspoon Ex-cludables. Of these, 31 were Guilt Phase Indudables and 20 were Nullifiers.
Further, according to Dr. Osborne, the survey reflected that Death Qualified juries in Rapides Parish excluded a disproportionate percentage of blacks compared to the percentage of whites excluded, and that these juries would be more conviction prone than juries selected in non-capital cases. The survey also revealed that as a group, DQs are more conviction prone than the three other groups.”
The issues of whether the exclusion of jurors who are not death qualified from the guilt/innocence phase of a trial in a bifurcated trial system such as ours results in juries which are more likely to convict and whether the exclusion of such jurors denies a defendant his right to a trial by jury from a representative cross-section of the community were recently discussed at length by the United States Supreme Court in Lockhart v. McCree, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).
In reviewing the lower court’s holding that a death qualified jury at the guilt/innocence phase of a trial violated the defendant’s rights as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, the court in Lockhart questioned the value of social science studies in support of the defendant’s constitutional claims and concluded that the studies *1278 either were too tentative and fragmentary to make out a claim for constitutional error or were of doubtful value in predicting the behavior of actual jurors. Id., 106 S.Ct. at page 1763. The court in Lockhart went on to explain that even if the defendant’s studies were considered both methodologically valid and adequate to establish that death qualification in fact produces juries somewhat more conviction prone than nondeath qualified juries, that the States are not prohibited from death qualifying juries in capital cases. The court stated that in order to find that a jury does not represent a fair cross section of the community, a distinctive group in the community must have been systematically excluded.
The court in Lockhart then distinguished the systematic exclusion of distinctive groups from the exclusion of non-death qualified jurors. First, death qualification, unlike exclusions based on, for example, race or gender, is carefully designed to serve the State’s conceded legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial. Second, non-death qualified jurors are singled out for exclusion in capital cases on the basis of an attribute that is within the juror’s control. Third, not all persons who believe that the death penalty is unjust are subject to removal for cause, only those persons who are unwilling and unable to temporarily set aside their beliefs in deference to the rule of law. Finally, exclusion of non-death qualified jurors does not prevent those persons from serving as jurors in other criminal cases. • Thereafter, the court concluded that non-death qualified jurors may be excluded from jury service without violating the basic objectives of the fair cross-section requirement. Id., 106 S.Ct. at pages 1765,1766.
The trial court in the instant case, like the court in Lockhart, questioned the value of the sociological studies presented by defendant’s experts. The trial court for instance, was not convinced that the questions asked actually reflected how a juror would vote in the guilt/innocence phase of trial. The trial court explained that conviction and acquittal-prone persons are among both the includable and the excludable and the fact that the percentages of each may be disproportionate in the two groups does not hinder the selection of a fair and impartial jury by either the defendant or the State. We likewise doubt the value of the studies presented by defendants for the reasons given by the trial court and for the reasons given by the Supreme Court in Lockhart.
Even assuming the validity of the studies presented by the defendant’s experts, Lockhart holds that states are free to disqualify non-death qualified jurors from participating in the guilt/innocence phase of a bifurcated trial. Further, our State Constitution imposes no greater burden than that an accused be afforded the right to a fair trial by an impartial jury. LSA-Const. of 1974, Art. 1, § 16; State v. Freeze, 438 So.2d 1340 (La.App. 3 Cir.1983), writ den., 466 So.2d 465 (La.1985). The exclusion of non-death qualified jurors allowed under La.C.Cr.P. art. 798 has frequently withstood constitutional challenges. See State v. Narcisse, 426 So.2d 118 (La.1983), cert. den., 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Monroe, 397 So.2d 1258 (La.1981), cert. den., 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983); State v. Berry, 391 So.2d 406 (La.1980), cert. den., 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981); State v. Kelly, 375 So.2d 1344 (La.1979). Defendant has no grounds for complaining of the exclusion of non-death qualified jurors because he did not exercise all of his peremptory challenges and was ultimately insulated from the jury’s recommendation and the trial court’s sentence of life imprisonment. State v. Jackson, 450 So.2d 621 (La.1984); State v. Edwards, 406 So.2d 1331 (La.1981), cert. den., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982).
Defendant’s final argument concerning the constitutionality of La.C.Cr.P. art. 798 *1279 is that it unconstitutionally excludes a disproportionate percentage of blacks as jurors.
There is no constitutional requirement that a petit jury must mirror the community, reflecting exactly the various distinctive groups in a population. Batson v. Kentucky, — U.S. —, 106 S.Ct. 1712, 89 L.Ed.2d 69 (1986). The United States Constitution does, however, prohibit all forms of purposeful racial discrimination at any stage of the jury selection process. Id., 106 S.Ct. at page 1718.
While purposeful racial discrimination is impermissible at any stage of the jury selection process, it does not follow that an otherwise legitimate right to challenge a juror for cause in a capital case, because of that juror’s inability to put aside his conviction against capital punishment, amounts to an unconstitutional and purposeful racial discrimination. We are not persuaded that defendant has proved that non-death qualified jurors are less likely to convict than death qualified jurors. Carrying this idea one step further, it is even less tenable that black jurors are less likely to convict in general than death qualified jurors. As the trial judge noted, blacks will likely be included among categories of both death qualified and non-death qualified jurors, and the defendant did not show that all blacks or even the majority of blacks would be excluded as non-death qualified on that basis alone. Finally, even if it were accepted as true that a disproportionate number of blacks would be excluded as jurors on the basis of being non-death qualified, such exclusion does not in any way amount to a wholesale exclusion based on race, but rather, on the State’s legitimate interest, as enunciated in Lockhart, of use of the same jury during both the guilt/innocence and the sentencing phase of a bifurcated capital murder trial. Id., 106 S.Ct. at page 1768; State v. Berry, supra.
Thus, assignments of error numbers 3 and 4 lack merit.
For the reasons set forth above, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. This court was provided only a partial transcript of the voir dire consisting of jurors excused for cause.

. The trial judge noted in his reasons for decision concerning defendant’s supplemental motion for change of venue that defense counsel exercised eleven out of a possible twelve peremptory challenges. LSA-C.Cr.P. art. 799.

. LSA-C.Cr.P. art. 798 provides;
"It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
******
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant’s guilt; ..."