496 So.2d 261 (1986)
STATE of Louisiana
v.
Bryan L. BROWN.
No. 85-KA-2389.
Supreme Court of Louisiana.
October 20, 1986.
Rehearing Denied November 13, 1986.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Charles F. Wagner, Dist. Atty., Earl Humphries, Thomas R. Wilson, Asst. Dist. Attys., for appellee.
Katherine S. Williamson, Alexandria, for defendant-appellant.
J. Michael Small, Alexandria, for defendant-appellant.
DIXON, Chief Justice.
Connie Smith, seventeen, was murdered on May 14, 1983 in Tioga, Louisiana.
*262 Bryan Brown, a twenty-one year old who lived in Miss Smith's neighborhood, was indicted for the murder, convicted and sentenced to death. We now reverse that conviction and remand for a new trial since the public sentiment in the community required the trial judge to grant defendant's motion for a change of venue pursuant to C.Cr.P. 622.
The motion for a change of venue was heard on May 1, 1985 before Judge Robert P. Jackson. Numerous representatives from the newspaper and radio testified concerning the extensive coverage given the Brown case. The press coverage was exacerbated when defendant escaped from jail and was missing for seven months before he surrendered in California. Hartwell M. "Jerry" Doty, an expert in the field of public opinion polling, testified that he conducted a poll in Rapides Parish on April 24 and 25 in 1985. The results of the poll indicated that the community's familiarity with the offense was nearly total. Of those polled, 87% had heard of the crime. While 53% of those polled had heard of Bryan Brown, an additional 27% were able to give the defendant's name. Fifty-nine percent of those who said they thought Brown was guilty believed he should receive the death penalty. When asked whether there was a high degree of prejudice against Bryan Brown in Rapides Parish, Mr. Doty said, "I think it's perceived by the people, in my judgment, that the man is guilty, and I think the people want him committed to death."
After the hearing on a change of venue but before the first juror was called on voir dire, the verdict in the trial of Kenneth Prestridge intervened. In Prestridge, a white twenty year old male was charged with the first degree murder of a sixteen year old white female. The state in Prestridge alleged that the victim had been beaten, raped, strangled and hung from a tree in a hangman's noose. The partially naked body had been found hanging from a tree in a wooded area.
The seven week Prestridge trial was reported in the local paper to be one of the longest district court cases in Louisiana history and to have cost the Rapides Police Jury about $40,000. Prestridge was found guilty of first degree murder and sentenced to life in prison on June 6, 1985. When the life verdict was announced, the Alexandria Daily Town Talk reported on the front page of the paper:
"A smile crept across Prestridge's face soon after the verdict was read. With the smile still on his face, he glanced quickly in the direction of [the victim's family].
. . . . .
As he left the courtroom ... the father of the victim shouted, `That son of a bitch will be out in 25 years.... He will kill one of your daughters, you wait and see.'
[A] family friend called to ... one of Prestridge's defense attorneys, `I hope you sleep good, Mr.___
. . . . .
[The victim's mother] surrounded by a phalanx of deputies, called him a `murderer,' and shouted, ` ... Big smile on his damn face. I'll kill him. Someone give me a gun and I'll shoot him.'"
The outrage of the community caused by the life verdict in Prestridge was clearly displayed in the letters that were received by the local newspaper. Some of the letters expressed anger at Prestridge's defense attorneys while others related to how jurors would feel if their own children were the next victims. Eventually, the editor placed a note in the paper indicating that approximately two hundred letters hostile to the verdict had been received but no more would be printed since the opinions were essentially the same.
Barely nine weeks after the letters appeared in the local newspaper, the voir dire for the trial of Bryan Brown began.
In State v. Bell, 315 So.2d 307, 311 (La. 1975) we listed some of the factors the trial judge should consider when determining whether to grant a motion for a change of venue: *263 "... (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire."
Virtually every prospective juror was aware of the general facts of this case. Mr. Doty referred to the knowledge of the community overall as "total saturation." Although the publicity generally was not inflammatory, it was thorough and extensive. One year after the crime occurred, the local paper published an anniversary article simply to recognize that a year had gone by and to reacquaint the community with the facts of the crime. Two months prior to the trial, thirty-six articles had been published in the Alexandria Daily Town Talk; the great majority of these had been placed on the front page.
After Bryan Brown was arrested and charged with the murder, he escaped from prison. Seven months later he surrendered to authorities in California and was brought back to Louisiana. Brown's escape, recapture and extradition increased the publicity and coverage of the case. Each time the case appeared in the paper, some version of Miss Smith's death and defendant's arrest, escape and re-arrest was rehashed. Readers were often reminded that Brown had been out on bond for an armed robbery charge at the time of the crime.
Several of the media representatives who testified at the hearing for a change of venue said this was one of the most heinous crimes that had ever occurred in the community. Ms. Smith had been a popular high school senior who was described in the media as a "high school beauty queen." She was a resident of the community who had excelled in academics and statewide beauty pageants. Understandably, almost everyone in the community followed the investigation and pretrial proceedings with interest.
Although defendant is not entitled to a jury that is totally ignorant of the case to be heard, Art. 1, § 16 of the Louisiana Constitution does grant him a right to trial by an impartial jury.
The facts and outcome in the Prestridge trial are critical to our conclusion that a change of venue should have been granted defendant. A defendant must prove more than community awareness of the facts surrounding his case. He must show that there exists a prejudice in the collective minds of the community that would make a fair trial impossible. State v. Wilson, 467 So.2d 503 (La.1985); State v. Felde, 382 So.2d 1384 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1979).
The extensive press coverage, when combined with the notoriety of the case and the outrage in the community over the life verdict in Prestridge, had a cumulative effect that deprived defendant of a fair and impartial trial. For this reason, the conviction and sentence are reversed and the case is remanded for a new trial.
Although the trial judge's error in refusing to grant defendant's motion for a change of venue is alone sufficient to reverse this conviction, we find a second assignment of error merits attention.
Defendant claims that certain jurors were properly challenged for cause by defense counsel but were not excused by the trial judge. Art. 1, § 17 of the Louisiana Constitution provides that an accused has a right to challenge jurors peremptorily, the number of challenges to be fixed by law. C.Cr.P. 799 provided at the time of this trial that, in trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have eight *264 peremptory challenges.[1] As Justice Marcus stated in State v. Monroe, 366 So.2d 1345, 1347 (La.1978), "an erroneous ruling of a trial judge which deprives a defendant of one of his peremptory challenges constitutes a substantial violation of a constitutional right requiring reversal of his conviction and sentence." See also, State v. Sugar, 408 So.2d 1329 (La.1982).
A prospective juror, Mrs. Linda Nash, began her testimony on voir dire by declaring that her son was a classmate of the victim for three years in high school and that the victim, Connie Smith, had visited her house on some occasions. Mrs. Nash knew Connie's parents and said she would have difficulty facing them if she voted not guilty. When asked whether this would influence her in the jury room, Mrs. Nash said, "Yes sir, I'm sure it would." When defense stated, "It would be very hard for you to be impartial," she responded, "That's true." It was not until questioned by the court that her son's relationship with the victim was revealed. Speaking of her son, she said:
"... his sophomore year, ah, I think he dated Connie a time or two and then they went on through sophomore, eleventh and twelfth grade together. Ah, my daughter had classes with Bryan's sister, so I know ... and I did know both families. I knew both families."
Questioning by defense counsel proceeded shortly thereafter as follows:
"Q [C.Cr.P. 797] says that a challenge exists, or we can excuse you for cause if: the relationship, whether by blood, marriage, employment, friendship, or enmity between the juror ... which would be yourself ... and the defendant, or the person injured ... Connie ... by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict.
My question to you is that your relationship, past relationship, present, with Connie, with her family, is it reasonable for us to believe that it would affect you in arriving at your verdict?
A Probably.
Q Okay, You would, as we discussed, you would have a great deal of difficulty in facing either the Brown family or the Smith family after this. Is that right?
A Yes."
Even though Mrs. Nash testified she could give the defendant a fair trial, it was unrealistic to conclude her relationship with the victim and victim's family would not affect her deliberations in reaching a verdict. The trial judge erred in refusing to grant defense counsel's request to excuse Mrs. Nash for cause. Because defense counsel's request was improperly denied, he was forced to exercise one of his peremptory challenges. This deprived him of the later use of this peremptory challenge since his eight challenges would be prematurely exhausted.
Defense counsel also challenged John O. Holliday for cause but this challenge was likewise denied by the trial judge. Mr. Holliday testified that he had followed the case for over two years in the paper and had formed an opinion as to the defendant's guilt. He was concerned that he had a mental "block" that he could not completely ignore. At different times throughout his testimony, Mr. Holliday stated, "you have something there that's just back in your mind ... it's always a block there, deep in your mind ... it's a block area in the back of your mind that you just can't completely ignore ... it's always a little something there, in the back of your mind, but you still have to go both sides of the case."
Toward the end of defense counsel's questions, Mr. Holliday was asked:

*265 "Q And again, and I know that I've asked you this, but I'm going to finish up now. Ah, it's my impression that you will try to be fair, you will listen to the judge's instructions, but as you sit here today there is a certain block, or hurdle, that Bryan Brown, through presenting evidence, will have to overcome. Is that right?
A Like I said a while ago ... oh, it is a block there that, ah, it's back of your mind that you just can't, ah, I'm going to be honest with you ...
Q Sure.
A ... you just can not wipe out."
Mr. Holliday confessed his belief that the prosecution would be "ahead of the game" at the beginning of the trial and that the defendant would need to overcome the "block" that he had in his mind. Although Mr. Holliday told the judge he could give the defendant a presumption of innocence, he thereafter was unable to tell defense counsel unequivocally that he could actually obey such a presumption.
When a prospective juror testifies to an inability to overcome preconceptions as to the defendant's guilt, he is subject to challenge for cause unless the examination shows unequivocally that he can be impartial. State v. Goodson, 412 So.2d 1077 (La.1982). Mr. Holliday's testimony shows he was uncertain whether he could overcome the "block" that had formed in his mind; therefore, defense counsel's challenge for cause should have been granted.
Jimmy Cockrell was the thirty-first prospective juror to take the stand. At this point in voir dire, the state had exercised four of its peremptory challenges while the defense had exercised all but its last. Only six jurors had been accepted.
Mr. Cockrell testified that although he did not know Connie Smith, his eight year old son played on the same little league baseball team with the Smiths' younger boy. He testified they had visited with the Smiths in the bleachers while watching the game. Mr. Cockrell also hosted a party for the baseball team that Connie's parents attended along with two of their sons.[2] Mr. Cockrell's final words to the court on voir dire were in response to defense counsel's question as follows:
"Q ... let's say you sat on this trial and you voted for guilty of first degree murder. Then you turned around and voted to let Bryan Brown live. Would that ... cause you problems next summer when you met these folks at the ball park?
A Possibly would."
Defense's request to excuse Mr. Cockrell for cause was denied. Defense used his eighth and last peremptory challenge to excuse the juror. When a prospective juror admits to having a personal relationship with the victim or the victim's family, it is unrealistic to believe the juror could be impartial in his or her deliberations concerning the defendant's guilt or innocence. Under C.Cr.P. 797 the trial judge erred in denying the defense attorney's request that Mr. Cockrell be excused for cause.
When ruling on a challenge for cause, the trial judge is vested with broad discretion that will not be disturbed on appeal unless shown to have been abused. State v. Sylvester, 400 So.2d 640 (La.1981). During the voir dire in this case the trial judge abused his discretion by incorrectly denying defense counsel's request that the jurors discussed above be excused for cause. This had the effect of reducing defense counsel's number of peremptory challenges from eight to five. If the defendant loses one of his peremptory challenges due to an incorrect ruling by the trial court, the defendant is denied a substantial constitutional *266 and statutory right that should result in a reversal of the defendant's conviction. State v. Sugar, supra; State v. Monroe, supra. Therefore, a second ground exists for reversing the verdict and sentence of the trial court.
For the reasons stated above, the conviction and sentence are reversed and the case is remanded for a new trial.
LEMMON, J., concurs in the reversal based on the refusal to grant the challenge for cause of prospective juror Nash, but deems it unnecessary to determine the merits of the other grounds for reversal.
NOTES
[1] Defendant was arrested in May of 1983. At that time C.Cr.P. 799 allowed him twelve peremptory challenges. An amendment to this article became effective on August 30, 1983 to provide only eight peremptory challenges. The trial court allowed the defendant only eight peremptory challenges and refused defense counsel's motion for additional peremptory challenges. The issue will be moot on remand due to a 1985 amendment of C.Cr.P. 799 that increased the number of peremptory challenges back to twelve.
[2] Five other jurors that were being questioned at the same time as Mr. Cockrell were excused for cause after Mr. Cockrell mentioned that the defendant had escaped while in custody awaiting trial on this case. It is unclear to this court why the trial judge excused these panel members who may not have been previously aware of the defendant's escape but did not excuse Mr. Cockrell who was the person who remembered the evidence of past crimes that was reported in the media.