524 So.2d 1194 (1988)
STATE of Louisiana
v.
Winthrop Earl EATON.
No. 87-KA-1199.
Supreme Court of Louisiana.
April 11, 1988.
Rehearing Denied May 12, 1988.
*1197 William J. Guste, Jr., Atty. Gen., James A. Norris, Jr., Dist. Atty., Joseph T. Mickel, Asst. Dist. Atty., for plaintiff-appellee.
Geary S. Aycock, Malcolm Decelle, Jr., Monroe, for appellant.
COLE, Justice.
The grand jury of Ouachita Parish returned a true bill indicting defendant Winthrop Earl Eaton for first degree murder, in violation of La.R.S. 14:30. The district attorney and the defense attorney stipulated that, in the interest of justice, the court should grant a change of venue and trial took place in Rapides Parish. Following the guilt phase of the bifurcated trial, the jury unanimously found defendant guilty as charged. Trial continued, pursuant to La.C.Cr.P. art. 905.1, et seq., and the jury unanimously recommended imposition of the death penalty. The jury based its recommendation upon the finding of the following aggravating circumstances: "(A) the offender was engaged in the perpetration or attempted perpetration of aggravated rape; (B) The offender was engaged in the perpetration or attempted perpetration of armed robbery or simple robbery; (C) The offense was committed in an especially heinous, atrocious or cruel manner." Thereafter, in conformity with the jury recommendation, the judge sentenced defendant to death. On appeal to this Court defendant presents thirteen assignments of error for the reversal of his conviction and sentence.[1] Because we find no reversible errors were committed either in the guilt or penalty determinations, we affirm the conviction and sentence of death.

FACTS
Almost immediately after his arrest defendant admitted killing Reverend Lea Joyner in order to steal her car for a trip to Florida. He never thereafter denied his commission of the crime, but defended against the charge on the basis of a dual plea of not guilty and not guilty by reason of insanity.
The murder occurred around midnight on March 11, 1985, in the parking lot of the Southside United Methodist Church of Monroe, Louisiana, where Rev. Joyner had been the minister for over twenty years. After killing Rev. Joyner and taking her car, defendant disposed of her body in a cotton field. He then went to Arkansas where he stayed with relatives. These relatives informed defendant's parents of his *1198 presence and the fact that he had arrived in a small, new, white car. The parents were aware of Rev. Joyner's disappearance and that the police were looking for her 1985 white Honda automobile. Consequently, they were suspicious of their son's involvement in the situation and notified the Monroe police he was in Little Rock, Arkansas. Communication with the Little Rock police confirmed the white car had a temporary Louisiana license. The license number was checked and it was ascertained to be the same as that on the car belonging to Rev. Joyner. Monroe police obtained a warrant for defendant's arrest and teletyped it to Little Rock where police effected the arrest. The Little Rock police advised defendant of his Miranda rights at the time of his arrest and again at the station before he gave a statement in which he admitted killing Rev. Joyner. He also drew a map indicating where he had left her body. A few hours later, police from Monroe arrived in Little Rock and interviewed defendant. After again receiving and waiving his Miranda rights, defendant gave another confession.
The following account of the crime comes from defendant's confessions. On several occasions when defendant passed the Southside United Methodist Church at the corner of Temple and South Fourth Streets in Monroe, Louisiana, he observed a small white car in the parking lot. He knew that a white woman who was usually at the church drove the car, but did not know her name or that she was the minister of the church. Defendant and a man named Isaac had discussed going to Florida and defendant planned to kill the woman and steal her car for the trip. On the night of March 11, 1985, defendant arrived at the church around 10:15 p.m. and hid behind a bush which was beside the church and waited for the woman to leave the church and come to her car in the parking lot. He had a heavy pipe, a knife, a blanket and some line from a weed-eater with him. He had been waiting for a short time when a woman, not Rev. Joyner, left the church. He remained behind the bush for another hour or so before Rev. Joyner came out and walked to her car, the small white one defendant wanted to steal. He hit her twice on the back of the head with the pipe as she was standing by the car ready to open the door. When he put her on the blanket he had spread nearby, he could see that she was not dead so he stabbed her three or four times. He tied the blanket with the weed-eater cord and put the body in the back seat of the car. He drove away slowly so that he would not attract attention because he knew the police would have stopped him if he had been driving too fast. He drove around the area until he found Isaac, who climbed into the car and informed defendant he would not make the trip to Florida with him. At some point Isaac noticed the body in the back seat and became very nervous. Isaac had defendant park on the side of a store and left the car. Defendant got out of the car and talked with Isaac briefly before driving away and leaving his companion behind. Outside of town, defendant turned into a cotton field and drove to the back where he stopped to think for a few minutes. After concluding it was not the time for farming, he decided to dump the body there. He also threw the victim's belongings in the field. Before he left, he tried to get his hand prints off everything, using the gloves he was wearing to wipe things. After leaving the field, he drove to Arkansas and spent the night at his grandmother's house in Warren. In the morning he went to his aunt's house in Little Rock where he was arrested.
In both statements defendant gave he denied raping the victim. He did admit taking a gun she was holding in her hand and also removing a ring she was wearing.
Jo Rugg testified she was a friend and parishioner of Rev. Joyner and had been with her until about 10:45 p.m. on March 11, 1985. The two had been in Rev. Joyner's office and Rev. Joyner had walked to the outside door with her and watched her get into her car. As she drove away from the parking lot, Ms. Rugg checked to see that Rev. Joyner had gone back into the church office building.
Mattie Crow, another good friend and parishioner, phoned Rev. Joyner each morning to awaken her. When Ms. Crow *1199 phoned on March 12, 1985, at 4:45 a.m., she received no answer. She called again, but there still was no response. She then phoned a church member and learned that Rev. Joyner's car was not parked at the church. At trial, she identified the gun found in the glove compartment of the victim's car, which had been seized in Little Rock at the time of defendant's arrest, as the gun she had purchased and given to the victim.
Bennie Fuller, the secretary-bookkeeper of the church arrived there a few minutes before 8:00 a.m. on March 12, 1985. A workman asked her to come to the side of the building where some construction was underway to see a spot he had discovered which looked like blood. She phoned Mattie Crow who came to the church. The women notified the police.
In the course of their investigation, the police removed a section of carpet from a walkway between two parts of the church complex which contained a spot thought to be blood. They also collected samples from other spots which appeared to be blood. They found a pair of glasses broken into two pieces which belonged to Rev. Joyner.
Shortly before midnight on March 12, 1985, defendant's parents talked with the police and communicated their suspicions of their son's involvement in the disappearance of Rev. Joyner. As previously set forth, this conversation ultimately led to defendant's arrest in Little Rock and the giving of the statements in which he confessed to killing the victim, but denied raping her.
In his testimony, Dr. George McCormick, the pathologist who performed the autopsy on the victim, detailed the extent of the injuries she received. He said she had traumatic injuries in three general areas: the neck, the chest and the head. She had three stab wounds in her neck; two of them had gone all the way through and one was superficial. The thirteen stab wounds in the chest had cut both lungs, the heart, and the aorta. Eight of the wounds went all the way through the chest and came out the back. There was extensive hemorrhage in the chest; the sternum (breastbone) had been cut into two pieces; there were multiple broken ribs on both sides from the force of the stabbing. The victim had multiple injuries on her head and neck. There was extensive bruising around the left eye which went across the bridge of the nose and to the corner of the right eye. The bone forming the eyesockets was fractured on both sides. There was a large laceration on the left side of her forehead which ran from the left eyebrow to the hairline and was so deep that the skull showed. There was a large laceration above the top of the right ear and a similar one on the left side of the head above and behind the left ear. A large hemorrhage beneath the entire scalp extended from the eyebrows to the back of the head. The victim had a large skull fracture which started at the top of the head, ran to the right and then continued across the floor of the skull to the left ear. The fracture almost completely separated the front of the skull from the back. There was bruising over the entire brain. The victim's pubic bone had been fractured and separated down the mid-line. There was an area of congestion in the vagina which suggested a traumatic injury. There were smudges on both her knees which appeared to be fingerprints.
The large number of sperm in the vagina indicated there had been recent intercourse.[2] The congestion in the vagina was consistent with an object, such as an erect penis, having been forcefully placed in the vagina. Dr. McCormick stated this had occurred before death because the "reaction of the blood increasing the circulation to the area that's traumatized would not happen after she was dead ... whatever made that discoloration was made before she died."
On cross-examination, Dr. McCormick said the blows to the head probably rendered the victim unconscious. However, on redirect by the prosecutor, he said the victim had lived at least fifteen to thirty minutes after the largest chest stab wound had *1200 been inflicted. He explained there were white cells in the area of the cut and this would not take place until that period of time had elapsed. He said it was possible the victim could have lived one to two hours after receiving her injuries.
In support of his insanity defense, defendant called Randall Grant, a clinical social worker at the Monroe Mental Health Clinic. Mr. Grant had interviewed defendant after his release from The Pines, an inpatient substance abuse facility. During this interview, on February 27, 1985, defendant indicated he smoked marijuana almost daily and had done so for the past five years. Defendant's discussion was rambling but could be focused with direct questioning. Defendant denied either auditory or visual hallucinations and also denied suicidal or homicidal ideation. Mr. Grant scheduled a psychiatric evaluation for March 6 and defendant was to return to see Grant on March 13.
John MacMahon was the psychiatrist who interviewed defendant on March 6, 1985. Dr. MacMahon was on the staff at Central Louisiana State Hospital. He conducted a thirty minute interview with defendant and saw no signs of major mental illness. He thought defendant's only problem was that he smoked a lot of marijuana. He talked with defendant's parents and told them that defendant would not stop smoking or become self-sufficient while they provided food and shelter for him. Thus, Dr. MacMahon suggested defendant's parents "kick him out." On cross-examination Dr. MacMahon said defendant's affect was appropriate and he showed no thought disorder. Reading between the lines of The Pines discharge paper, he believed defendant had been discharged because he was uncooperative and was breaking the rules. The prosecutor asked the doctor about specific aspects of the case as they might indicate defendant's ability to discern right from wrong. The doctor said planning was a sufficient factor in determining whether defendant knew right from wrong. He did not think that observing the speed limit was such a factor, but said wiping his fingerprints and fleeing the scene showed defendant realized he was in trouble. On redirect, defense counsel asked about the effect marijuana usage would have and the doctor said marijuana impairs judgment. However, in response to the prosecutor's question, Dr. MacMahon said it was his understanding marijuana did not affect the ability to know right from wrong.
Defendant's final witness was his father, Wade Eaton. Mr. Eaton said defendant had made fair grades in the early years, but his work became poorer until he finally was in special education classes. He said defendant's problems began in 1981. Defendant was 14 or 15 when he began experimenting with drugs, particularly marijuana. He referred to defendant's unusual behavior with animals. Defendant would at first treat the animal well, then kill it and sleep with the dead body. Defendant would become angry and would destroy things. Once he knocked out all the windows in the house. Defendant had several short term jobs but would have problems with supervision. The longest job defendant had lasted only five or six weeks. In 1984 he sought professional help for defendant who had become "mighty violent." Finally, on February 1, 1985, defendant was admitted to The Pines in Shreveport where he stayed one day short of three weeks. After talking to Dr. MacMahon, Mr. Eaton attempted to put defendant out of the house. Mr. Eaton said he gave defendant one week before he had to leave. He placed this talk on a Wednesday. He said he had another talk with defendant on Sunday, March 10, 1985, and then did not see him again. He added his wife saw defendant around 4 or 4:30 p.m. on Monday, which was the day of the crime. He said defendant had no realistic goals, explaining defendant talked of a musical career but had no musical talent. He added defendant carried a Bible with him and even had one inside his underwear. He said defendant grinned at everything and was the same in jail. According to Mr. Eaton, defendant "never has shown a moment worth of sorrow since it happened."
In rebuttal, the prosecutor called Dr. Norman L. Mauroner, a psychiatrist at the *1201 VA Hospital in Shreveport. He had examined defendant on June 4, 1985, and on June 19, 1985, and believed at the time of the crime defendant knew what he was doing. He found no overt mental illness. He believed defendant had a personality disorder which does not qualify as insanity. He stated the facts of the case indicated careful planning which in turn indicated defendant knew what he was doing. Unlike Dr. MacMahon, Dr. Mauroner did think driving within the speed limit showed defendant was covering his tracks. He added defendant's use of the gloves to wipe away his fingerprints reinforced his opinion and defendant's I.Q. of 70 or 71 placed him at the upper limit of mild mental retardation.

ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO
By these assignments of error, Eaton contends the introduction of photographs of the victim in both the guilt and penalty phases prejudiced him and constitutes reversible error. The state introduced two sets of photographs of the victim, which were objected to at trial by the defense as irrelevant, gruesome and prejudicial. Eaton argues the pictures were not offered to prove any material fact in issue and instead were introduced merely to inflame the jury against him. This is supported, he claims, by the fact the prosecutor saved the complained of photographs as the last exhibits to display to the jury, at the end of the guilt phase. Eaton also points to a newspaper article which reported two female jurors were wiping their eyes as if they were crying when some of the more "graphic" evidence was shown to them. Also, he complains that during rebuttal argument in the sentencing phase, the prosecutor waived one of the challenged photographs of the victim and stated, "You saw the victim. She's talking to you. Can't you hear her? Don't you hear her saying do justice today?"
This court has established a number of well settled guidelines regarding the introduction of photographs. The mere fact a photograph is gruesome does not in and of itself render a photograph inadmissible. The test of admissibility is whether the probative value outweighs any prejudicial effect which may result from the display to the jury. State v. Comeaux, 514 So.2d 84 (La.1987); State v. Beach, 320 So.2d 142 (La.1975); State v. Morris, 245 La. 175, 157 So.2d 728 (1963). Generally, photographs of a victim's body which depict the fatal wounds are revelant to prove the corpus delecti, to establish the identity of the victim, the location, severity and number of wounds, and to corroborate other evidence of the manner in which the death occurred. Comeaux, 514 So.2d at 96. The trial court's admission of an allegedly gruesome photograph will be overturned on appeal only if the prejudicial effect clearly outweighs the probative value. No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543 (La.1986).
The first set of challenged photographs was taken when police discovered the victim's body in the cotton field, one day after the murder. Six photographs were objected to. Two show the entire body of the victim taken from different angles. Several of the photographs taken at close range, depict the victim's head, neck and upper body, including the chest area. One picture, taken after the body had been turned over, depicts a tear in the undergarment and wounds in the back. The trial judge ruled the photographs were admissible to show the scene of the crime, the wounds to the victim's face, mouth, torso and back, as well as the tearing of the undergarment.
The second set of photographs was taken at the coroner's office, after the body had been cleaned of blood and debris. Of the six challenged photographs, one shows a cut in the victim's undergarment. This cut was made across the pubic area and continued down the victim's left leg. The remainder of the photographs depict the wounds suffered by the victim. A ruler was used to demonstrate the length and width of the wounds to the forehead, the *1202 left and right side of the victim's head, her neck and chest. The state offered these photographs in conjunction with the testimony of Dr. McCormick, the coroner, as to the cause of death. Again, the trial judge ruled the photographs were admissible to show the extent of the wounds and the tear in the girdle. When the judge so ruled, Eaton moved to suppress in limine the first set of photographs on the basis the second set depicted the wounds better and exhibiting the first group would be merely cumulative. The trial judge denied the motion. He concluded that although some of the photographs were "gruesome" their probative value exceeded any prejudicial effect they may have on the jury.
These photographs are clearly not pleasant. However, in the guilt phase they were highly relevant to establish the nature and extent of the wounds and corroborate the testimony of Dr. McCormick as to the cause of death. The photographs depicting the tear in the victim's girdle were probative in proving a rape did occur, which was a much disputed issue at trial. Upon reviewing the photographs, we conclude the trial judge was correct in finding their probative value outweighed any possible prejudicial effect which may have resulted from their display to the jury.[3]
In the sentencing phase, the state sought the death penalty on the basis the crime was committed in an especially heinous, atrocious, or cruel manner. The challenged photographs show the nature and extent of the wounds inflicted on the victim by Eaton, and were extremely probative in proving this aggravating circumstance. No amount of testimony could depict the heinous nature of Eaton's crime as well as the photographs could, and the state acted properly in introducing them. We cannot conclude the photographs so inflammed the jury as to lead it to recommend the death penalty and find no error resulting from the introduction of the photographs in the sentencing phase of the trial.

ASSIGNMENT OF ERROR NUMBER THREE
With this assignment of error defendant contends the trial judge erred when he refused to allow Otis Robinson to testify regarding a conversation he overheard between Isaac Green and defendant prior to the murder of the victim.
As previously set forth, defendant confessed he killed the victim so he could steal her car for the trip he and Isaac Green were to take to Florida. In his testimony as a defense witness, Green admitted he had told defendant they would go to Florida together if defendant secured a car for the trip. Both Eaton, in his confession, and Green, in his testimony, recalled meeting at Robinson's home the Saturday before the murder. The defense's attempt to elicit the conversation from Robinson was thwarted by the court's ruling anything relating to the conversation would constitute inadmissible hearsay. The defense did not attempt to proffer Robinson's testimony. It did, however, attempt to proffer a statement made by Robinson to police several days before the trial began which outlined the conversation the defense hoped to introduce at trial. The court rejected the proffer at the conclusion of the guilt phase, but allowed the defense to proffer the statement during the sentencing phase. We assume Robinson would have testified consistently with his statement to police, and use it to determine whether the court committed reversible error in excluding his testimony.
*1203 In the guilt phase, Eaton's only defense was insanity. The defense sought to, among other strategies, establish that the nineteen year old Eaton was not acting under his own volition, but under the control and domination of the manipulative Isaac Green, an experienced criminal. The defense's theory was that the eighteen year old Green was able to manipulate Eaton into committing the crime of murder by his promises of a trip to Florida with refuge at his parents' home.
At trial, Green divulged he was known, among other aliases, as the "Youngest Crime Boss." He explained in his prosecution by the state of Florida for a series of rapes, armed robberies, burglaries and assaults, he was labeled the "mastermind" behind the crimes. He stated in several of the crimes accomplices were involved, whom he referred to as his "protegees." Green currently is serving eight life sentences in Florida.
Eaton and Green first met in a cell in Monroe City Jail. As cellmates, they became friends and discussed making a trip to Florida where they would stay with Green's parents. After being released from jail, they met several times and discussed stealing a vehicle to make the trip.
In his confession, Eaton asserted he told Green of his plan to murder the owner of the vehicle, and indicated Green encouraged him to "do it," to do whatever was necessary to obtain the vehicle. Green, however, denied any involvement beyond the plan to steal the vehicle. He admitted discussing going to Florida with Eaton and planning to steal a vehicle for that purpose, but insisted it was Eaton who sought him out and not vice versa. His knowledge, he testified, was limited to the location of the vehicle at the church. He denied any knowledge of or involvement in Eaton's plan to commit murder. He also testified he never actually intended to go to Florida with Eaton, but told him he would do so to "get the monkey off my back." Green did recall seeing Eaton at Robinson's home the Saturday before the murder, but testified their discussion was limited to general conversation, such as "how things were going." He stated he and Eaton did not discuss going to Florida in Robinson's presence, but admitted he obtained a piece of paper while at Robinson's home and wrote for Eaton the address in Florida where they would be staying.
Otis Robinson was unable to testify as to the conversation he overheard between Eaton and Green at his home on the Saturday before the murder. However, in his statement to police, Robinson recalled that Eaton advised Green everything was ready for the trip and described the car as being white. He also stated that Green questioned Eaton about some credit cards and told Eaton, "don't leave them credit cards behind." After Eaton departed, Green told Robinson, "I'm gonna let the nigger go and get them credit cards, think I'm going but I ain't going." Lastly, Robinson asserted several weeks after the murder, Green told him that although he did not participate in the murder of Rev. Joyner, he helped Eaton "dump" the body.
We can summarize Otis Robinson's account of the conversation as follows. First, it contradicted Green's claim he and Eaton did not discuss going to Florida in Robinson's presence. However, Green testified he and Eaton planned to take a trip to Florida. Secondly, Robinson would have told the jury Green never really intended to go to Florida with Eaton. Again, however, Green testified he never really intended to take the trip.
The two remaining portions of Robinson's statement are relied on heavily by the defense. These portions are Green's reference to the credit cards and Green's claim he helped to dispose of the body. The defense argues these statements are not hearsay, and they should have been admitted in both the guilt and penalty phases as bearing on Eaton's state of mind in committing the offense.
We agree with Eaton that Green's reference to the credit cards was not hearsay. This court had adopted the following definition of hearsay:
Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered *1204 as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.
State v. Martin, 356 So.2d 1370, 1373-74 (La.1978). Thus, where an utterance is offered circumstantially to show the effect it had on the mind of the person who heard it, the utterance is not hearsay because its value does not lie in its truthfulness, rather, its value lies in the fact it was said. Whether or not the statement was made depends on the veracity of the in-court witness who is testifying, and not the out-of-court declarant. State v. Weiland, 505 So.2d 702 (La.1987).
The statement regarding the credit cards was offered by the defense to show the effect it had on Eaton's state of mind, that is, to show that Eaton was acting under the control of Green instead of his own volition. The probative value of the statement rested in its having been said, and as such, it did not constitute hearsay. We find this statement should have been admitted by the trial judge. On the other hand, the statement regarding the disposal of the body was hearsay. It was offered by the defense to show the extent of Green's involvement in the murder, from which it was to be inferred that Eaton was acting under Green's control. For the sought after inference to be created, the matter asserted had to be true. Thus, it had to be true that Green helped dispose of the body for the statement to have probative value. Finding no exception to the hearsay rule applicable in this case, we conclude the trial court properly excluded the latter statement in the guilt phase.
With respect to the guilt phase, the question remaining is whether the erroneous exclusion of Green's statement to Eaton to "get the credit cards" requires this court to reverse Eaton's conviction for first degree murder. We conclude it does not. In State v. Gibson, 391 So.2d 421 (La.1980), we adopted the test enunciated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This test requires a reviewing court to decide whether there is a reasonable possibility the exclusion of the evidence "might have contributed to the conviction," and whether the error is "harmless beyond a reasonable doubt." We conclude beyond a reasonable doubt the error did not affect the outcome of the trial.
The evidence fell woefully short of establishing the insanity defense. Under our law, the defendant bears the burden of proving by a preponderance of the evidence he was insane at the time of the offense. The defendant must persuade the jury he suffered from a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct in question. La. R.S. 14:14; State v. Welcome, 458 So.2d 1235 (La. 1983); State v. Brogdon, 426 So.2d 158 (La.1983). In attempting to escape criminal responsibility, the defense principally relied on the following factors: (a) Eaton's low IQ of 70, which is borderline mentally retarded-normal; and (b) Eaton's association with Green.
The psychiatric testimony refuted any notion Eaton was insane at the time of the offense. Both the defense and the court-appointed psychiatric experts testified Eaton was sane at the time of the murder. Dr. John MacMahon, a psychiatrist who testified for the defense, examined Eaton just six days before the murder. He believed Eaton's biggest problem was his marijuana use, but testified heavy marijuana use does not affect the ability of one to know right from wrong. Dr. Norman Mauroner, the psychiatrist who examined Eaton after the murder, found Eaton suffered from a "personality disorder" but concluded he did know right from wrong at the time of the offense. To support this conclusion, he pointed to Eaton's actions which demonstrated he was aware of his wrongdoing. First, Eaton carefully planned the murder. He searched the town for a suitable vehicle, gathered the instrumentalities he would need to commit the murder and dispose of the body, and lay in waiting approximately two hours until he could confront his victim alone. Secondly, Eaton "covered his tracks." He admitted in his confession to driving slowly so the police *1205 would not stop him; he wiped off his fingerprints from the objects left behind at the scene; he abandoned the body in a field; and, he fled the state. The experts agreed such actions indicated an appreciation of the wrongfulness of one's conduct.
In addition, Eaton admitted he was aware what he had done was wrong. In his confession to police, one day after the murder, in reference to his disposing of the body, Eaton stated, "I realized that I had done wrong not just because of mankind, really I had done wrong with God really. You know, I understand what I've done and I knew right and all of this...." Later in his confession, Eaton asserted, "Right now, I totally realize that I done wrong." Thus, the evidence showed that far from being insane at the time of the offense, Eaton was able to appreciate the wrongfulness of his conduct, and thus able to distinguish right from wrong.
Even if Green's reference to the credit cards had been placed before the jury, we have no doubt the jury would still have refused to return a verdict of not guilty by reason of insanity. Even with this evidence, the defense simply would have been unable to persuade the jury Eaton was acting under the dominion and control of Green to the extent he was rendered unable to distinguish right from wrong. There is no evidence that Eaton was physically or mentally coerced by Green to commit this brutal murder. The evidence of Green and Eaton's association, as presented to the jury, included Eaton's claim he told Green of his plan to commit the murder, and Green's encouraging him to do whatever was necessary to obtain the car. The jury had before it evidence of Green's criminal reputation as a "mastermind" behind violent crimes, as well as Green and Eaton's plot to steal a vehicle. The only additional information the jury would have obtained from the excluded evidence was that Green was telling Eaton to commit robbery. All of the evidence admitted on the question of Eaton's state of mind, combined with this evidence, could not have established Eaton was under Green's control to the point of being unaware of what he was doing in committing this brutal murder. Because the evidence showed unquestionably Eaton was sane at the time of the murder, and the admitted and excluded evidence on the question of influence combined could not have established otherwise, we conclude the error was not reversible because beyond a reasonable doubt the exclusion of the evidence had no impact on the guilty verdict.
We now address Eaton's contention the death sentence must be reversed because of the exclusion of Robinson's testimony in the sentencing phase. During the sentencing phase, Robinson was again precluded from testifying about the conversation between Eaton and Isaac Green by the trial court's ruling such testimony would be hearsay. The defense asserts this testimony was offered in support of a statutory mitigating circumstance, that is, to show "the offense was committed while the offender was under the influence or domination of another person." La.C.Cr.P. art. 905.5(c). This evidence, the defense posits, was relevant in showing Eaton acted under Green's control in committing the brutal murder, and therefore Eaton was deprived of a fair trial on the issue of punishment because of the exclusion of relevant mitigating evidence.
In evaluating the defendant's position, we begin by recognizing that it is well settled in Louisiana that a defendant in a capital case should be allowed to place before the sentencing jury all relevant evidence in mitigation of punishment. State v. Weiland, 505 So.2d 702, 707 (La.1987). We also recognize that the United States Supreme Court has held in capital cases the sentencer "may not be precluded from considering `any relevant mitigating evidence.' " Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986). See also, Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This rule stems from the Eighth and Fourteenth Amendment protections which guarantee the defendant a fair trial on the issue of punishment. Thus, the United States Supreme *1206 Court has vacated death sentences where the sentencer was precluded from considering relevant mitigating evidence which bore on the character of the accused or the circumstances of the offense. See, Id.
Nevertheless, the question arises as to whether any error in excluding even remotely relevant mitigating evidence mandates a reversal of the sentence, even where it is clear beyond a reasonable doubt the evidence could not have affected the jury in its determination of the death penalty. We believe it does not. As the United States Supreme Court recently noted, it is only in the absence of a showing that the exclusion of mitigating evidence "was harmless, or that it had no effect on the jury," that the jurisprudence holds a death sentence invalid. Hitchcock v. Dugger, ___ U.S. ___, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987).
We now hold that exclusion of Robinson's testimony at the sentencing phase did not deprive Eaton of a fair trial and was not error requiring a reversal of the death penalty imposed below. The totality of the evidence which did go to the jury shows beyond a reasonable doubt defendant was not under the domination of Green to commit murder. The proffered testimony of Robinson at the sentencing phase regarding the credit cards and Green's alleged help in disposing of the body simply could not have affected the jury's finding as to mitigating circumstance of influence and domination found in La.C.Cr.P. art. 905.5(c).
The jury already knew of Green and Eaton's association, including Eaton's claim that Green knew of the plan to commit a murder and Green's encouragement to "do it." The jury already knew of the eighteen year old Green's reputation as a "mastermind" behind violent crimes, as well as Green and Eaton's plot to steal a vehicle. There was no evidence that Eaton was directly coerced, either physically or mentally, to commit this brutal murder. Thus we find beyond a reasonable doubt the excluded evidence, which was cumulative on the issue of influence or domination, would have had no impact on the jury's finding in that regard. Moreover, not only is the proffered testimony of Robinson that Green said he helped dispose of the body merely cumulative on the alleged mitigating factor of influence or domination, but evidence of what Green did after the murder is arguably not even relevant to Eaton's state of mind at the time of the murder. The fact that Eaton picked up Green in the stolen car while carrying the body might indicate that Eaton's state of mind up to that point was that Green approved of murder. However, whether Green then proved Eaton right or wrong by his actions, in either helping to dispose of the body or by refusing to do so, is irrelevant because the murder was already committed.
We are not here concerned with influence or domination to commit a theft or robbery. La.C.Cr.P. art. 905.5(c), in establishing a statutory mitigating circumstance, must be viewed only within the context of the offense with which the defendant is charged. It is clear from the record in this case the defendant was not under the domination or influence of Green to commit a murder. The jury had no evidence from which it could reasonably conclude such was the case. To the contrary, it had overwhelming evidence of the defendant's singular role in preparing for and executing the deed. The extent of his preparation and the length of time he waited to accomplish his purpose illustrates his desire and determination to carry out the act. Certainly, these factors negate any idea of operative influence or domination. We conclude there is a sufficient showing in this case that the exclusion of Robinson's testimony in the sentencing phase had no effect on the jury's sentence recommendation.
Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
By this assignment of error, defendant contends that the jury instructions given by the trial court unduly influenced the jury to believe it was mandatory to impose *1207 the death sentence. Defendant complains that the judge did not give five of the instructions he requested and further complains the judge misread the unanimity requirement of the finding of an aggravating circumstance before consideration of the death penalty as a sentencing alternative.
Defendant requested jury instructions for the penalty phase of the trial. The first concerns the necessity of each juror finding beyond a reasonable doubt that at least one statutory aggravating circumstance exists. The second is that the law presumes the defendant convicted of capital murder is innocent of any aggravating circumstances. The third states that the jury cannot automatically impose the death penalty, even if the state proves one or more aggravating circumstances, without first considering mitigating circumstances and evidence. It also states that the Court is required to impose a sentence of life imprisonment if the jury is unable to reach a unanimous decision in recommending a sentence. Defendant says that the basis of these three instructions "was to place before the jury, clearly and unambiguously, their duty in unanimously finding beyond a reasonable doubt the aggravating circumstance." He relates his argument on the judge's failure to give these three requested instructions with his complaint that the judge failed to include the term "unanimously" in his instruction regarding the finding of aggravating circumstances.
A requested jury instruction is to be given if it is pertinent, correct and needs no explanation. La.C.Cr.P. art. 807; State v. Lombard, 486 So.2d 106 (La.1986). However, the judge need not give it if it is included in his general charge to the jury. State v. Jones, 474 So.2d 919 (La.1985); State v. James, 431 So.2d 399 (La.1983). Defendant's first three requested charges were covered by the judge's general charge to the jury. He instructed the jury "[b]efore you decide that a sentence of death should be imposed you must unanimously find beyond a reasonable doubt that at least one statutory aggravating circumstance exists." Although the judge did not repeat the word "unanimously" when giving additional instructions, the charge taken as a whole makes it clear that the finding of an aggravating circumstance must be unanimous. Compare, State v. Knighton, 436 So.2d 1141 (La.1983).
Defendant's fourth requested jury instruction was that a mitigating circumstance did not have to be proven beyond a reasonable doubt. Instead the jury was to be told that it "must find that a mitigating circumstance exists if there is any substantial evidence to support it." We find no error.
Defendant's final request was that the jury be instructed it was "to presume that if you sentence [defendant] to life imprisonment without the benefit of probation, parole or suspension of sentence, he will spend the rest of his life in prison. You are to make no other presumptions." This Court has considered the propriety of a requested instruction similar to this one and held that the judge did not err in refusing to give it. In fact, the Court believed that "such a charge calls the jury's attention to the possibility of early release." Jones, 474 So.2d at 933.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NUMBERS FIVE AND SIX
In these assignments defendant focuses upon several comments made by the prosecutor during closing and rebuttal arguments at the conclusion of the penalty phase of the trial. Defendant contends these remarks inflamed the jury and interjected passion and prejudice into the proceedings.
Defendant first complains that the prosecutor referred to the victim as a "a member of the most discriminating class in America, murder victims." When the judge overruled the defense objection, the prosecutor paraphrased the remark. Later, in his rebuttal argument, the prosecutor told the jury he had done all he could, that he did not have the authority to do more. He said it was now up to the jurors to do their duty. He told them death was something we do not wish to think about, but they *1208 should think about the thousands of deaths that occurred during World War II "because our boys had to kill to preserve our way of life." He told the jury that was the issue before them: "preserv[ing] our way of life." Near the end of the rebuttal argument, the prosecutor referred to the death penalty as "society's act of self defense" and said it was "the enforcement of society's right to be free from murderers." The judge overruled defense counsel's objection. The prosecutor called the jury's attention to the fact that Rev. Joyner had a gun, indicating to him she believed in self-defense. He then said:
It's the right of self defense of society. And if you fail to return that death penalty you have shirked your responsibility to your fellow man. You saw the victim. She's talking to you. Can't you hear her? Don't you hear her saying do justice today? Do justice. Enforce society's right of self defense or the safety you now enjoy most of the time in your home or at your church or on the street will be no more. She's crying to you. Please hear her.
After the jury retired to deliberate, defense counsel moved for a mistrial on the basis of the allegedly improper remarks made by the prosecutor during closing arguments. The judge denied the motion.
Closing argument is to be confined to the evidence admitted, to the lack of evidence, to conclusions of fact which may be drawn therefrom and to the law applicable to the case. La.C.Cr.P. art. 774. The argument is not to appeal to prejudice. The Court has warned prosecutors they are not to turn closing argument into a plebiscite on crime. State v. Sugar, 408 So.2d 1329 (La.1982); State v. Hayes, 364 So.2d 923 (La.1978). Nevertheless, before the Court will reverse on the basis of improper closing argument, it must be thoroughly convinced the remark influenced the jury and contributed to its verdict. State v. Ford, 489 So.2d 1250 (La.1986); State v. Mattheson, 407 So.2d 1150 (La.1981). In making this determination, the Court gives credit to the good sense and fairmindedness of the jury. State v. Jarman, 445 So.2d 1184 (La.1984). The remarks of which defendant complains were not of such magnitude that, of themselves, they would have caused the jury to recommend the death penalty. In particular, the jury found the existence of three aggravating circumstances, one of which was that the crime was committed in an especially heinous manner.
The other aspect of these assignments of error concerns the prosecutor's reference to the victim's pubic bone having been broken when she was raped. Defendant says the autopsy report indicated the fracture was a post-mortem one. However, he concedes this report does not form part of the record. Moreover, defense counsel did not cross-examine Dr. McCormick about whether the victim was dead or alive at the time this fracture occurred or even about the fracture. The testimony was clear that the victim was still alive at the time of the rape. The prosecutor expressed the opinion that the marks on the victim's knees resulted from defendant pushing her legs down so that he could have intercourse. It is true the marks could not be identified as belonging to defendant, but the logical conclusion to be drawn from the facts was the one stated by the prosecutor. We do not believe these comments of themselves influenced the jury or contributed to the verdict, and therefore do not find the comments rise to the level of reversible error.
Accordingly, these assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBERS SEVEN AND TWELVE
By these assignments of error defendant argues the trial court erred in failing to grant his request for a mistrial at the beginning of the sentencing hearing, based upon a bomb threat communicated to the jury on the eve of the hearing. The defendant also argues the bomb threat and other factors made the jury's sentence excessive in that it was imposed under the influence of fear, revenge, passion, prejudice and public pressure. See, La.C.Cr.P. art. 905.9 and La.Supreme Court Rule 28, *1209 § 1(a). This challenge is based on the combination of public sentiment in Rapides Parish after a previous capital murder trial ended in a life sentence for the defendant, and a bomb threat which was received at the hotel where the jurors were staying.
The public pressure on the jury to impose the death penalty, Eaton argues, emanates from previous capital cases tried in Rapides Parish. Eaton's trial was originally to be held in Ouachita parish, but upon joint stipulation of the defense attorney and prosecutor, the trial was moved to Rapides parish. Since 1985, Rapides parish has been the setting for three capital cases prior to Eaton's: State v. Prestridge, 507 So.2d 1271 (La.App. 3d Cir.1987); State v. Brown, 496 So.2d 261 (La.1986); and State v. Comeaux, 514 So.2d 84 (La.1987).
Prestridge involved the brutal murder of an Alexandria girl who was raped and whose body was hanged from a tree. In the 1985 prosecution for the murder, Kenneth Prestridge was convicted of murder, but was sentenced to life. The community was outraged over the life sentence, as it demonstrated through hundreds of letters to the local newspaper voicing hostility at the sentence. This court acknowledged the community outrage flowing from the Prestridge case when we reversed the conviction of Bryan Brown for first degree murder. Brown had been convicted of first degree murder and sentenced to death in Rapides parish for the murder of a local high school girl. The voir dire in the Brown case began barely nine weeks after the letters voicing outrage at the Prestridge verdict appeared in the local newspaper. In reversing Brown's conviction, we found the trial judge should have granted his motion for a change of venue. We concluded the extensive press coverage and notoriety surrounding the Brown case itself, resulting from Brown's escape from prison, and the community outrage over the life sentence in the Prestridge case, had a cumulative effect of depriving the defendant of a fair trial.
In Comeaux, the defendant was brought to trial on and was convicted of first degree murder and sentenced to death. His death sentence was reversed by this court on the basis of a violation of his sixth amendment right to counsel. Thus, since 1985, in all three of the capital cases held in Rapides parish since the Prestridge trial, the jury has recommended the sentence of death for the defendants.
Eaton argues the public pressure on juries in Rapides parish to impose the death sentence because of the Prestridge case, combined with a bomb threat levied at the jurors in this case, caused the jury to recommend the death sentence. The evening before the sentencing hearing was scheduled to begin, a bomb threat was received at the hotel where the jurors were staying. The judge ordered the jurors be brought to the courtroom at once. However, he did not communicate with them and did not inform the attorneys of his actions. The jurors spoke only with the bailiffs, who upon learning there was no bomb at the hotel, asked the jurors whether they wished to return to the hotel. All of the jurors agreed to do so. There is no record of the communications between the jurors and bailiffs. The next morning, the defense moved for a mistrial, which was denied by the trial judge. The judge told the jury:
Ladies and gentlemen, I understand that you had some excitement last night. I want to advise you that unfortunately this kind of thing happens in capital cases such as this. I previously presided in a capital case in which there were two threats that bombs were set to go off in the courtroom. Nothing ever happened. In my opinion it was a crank call someone trying tosometo be funny I suppose. But it isn't funny at all. But I do want to advise you quite seriously that it is in no way to affect your attention, your deliberations, or your verdict in this matter. I sincerely hope that it will have no affect whatsoever on your final determination in this case. And my instructions are to you that you are to as best you can wipe it out of your mind only decide this case upon what occurs in this courtroom and no where else.
The record shows the jurors assured the court the incident would have no effect on their deliberations and final decision.
*1210 Our review of the voir dire examination of the jurors chosen to serve on Eaton's jury reveals two jurors were aware of the Prestridge case, two were aware of Brown and two were aware of both cases. Of the jurors who recalled the Prestridge case, one was aware he received a life sentence for what she called a "horrible crime," but also stated she thought he got what he deserved. The other juror could not recall any of the particulars of the case. Neither of the jurors who recalled the Brown case paid very close attention to the case. One stated he formed no opinion and another stated she did not know the sentence he received. Of the two jurors who recalled both cases, one admitted he heard of the cases but stated he did not follow them closely. The other juror knew the parents of the victim who was killed by Bryan Brown, but stated her decision would be unaffected by such knowledge. The remaining jurors either denied knowledge of any capital cases in the area in the last several years, or were not questioned during the voir dire examination on the subject.
Under these circumstances we cannot find the death penalty was made under fear and pressure such that it must be reversed. The jury assured the court the bomb scare would have no effect; yet, defendant posits that we must disregard this assurance upon the insinuation that Rapides Parish is still so incensed over the Prestridge case that no Rapides Parish jury would have failed to infer that members of the local community were warning them to impose the death penalty. Our review of the voir dire examination belies this argument.
Accordingly, these assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER ELEVEN
In this assignment of error defendant contends the jury erred in determining the crime was committed in an especially henious, atrocious or cruel manner because there was insufficient evidence to support this finding.
Defendant is correct this Court has defined "torture" as serious physical abuse of the victim before death. State v. Sonnier, 402 So.2d 650 (La.1981). The Court has also said this aggravating circumstance is present when the murder was carried out in an inhumane manner or the death was particularly painful. State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Baldwin, 388 So.2d 664 (La.1980). The Court has considered this issue as it relates to multiple stab wounds several times, most recently in State v. Brown, 514 So.2d 99 (La. 1987). The victim in that case received thirteen stab wounds, but there was no evidence regarding the length of time it would have taken the victim to bleed to death or whether he suffered greatly before losing consciousness. Nevertheless, the Court said: "Considering the evidence of the manner in which the wounds were inflicted, we find substantial support for the jury's finding that the murder was committed in an especially heinous, atrocious and cruel manner." Id. at 113. The Court noted it had upheld jury findings that the offense was committed in an especially cruel and heinous fashion in other cases where there was the infliction of multiple stab wounds, citing State v. Taylor, 422 So.2d 109 (La.1982) (more than 20 stab wounds); State v. Moore, 414 So.2d 340 (La.1982) (13 stab wounds); and State v. Clark, 387 So.2d 1124 (La.1980) (30 to 35 stab wounds).
In the instant case, the victim received sixteen stab wounds, three more than the victim in Brown, as well as at least two blows to the head with a heavy pipe.[4] There was evidence she probably was rendered unconscious by the first blow with the pipe. Nevertheless, one of the blows to the head was of such severity that *1211 it literally split the skull. The pathologist testified the victim lived a minimum of fifteen to thirty minutes, and possibly an hour or two, after she received the largest of the stab wounds. Defendant, in his statement, said he stabbed the victim because he could see she was not dead after he had hit her with the pipe. Given the facts of this case, we find there is "substantial support" for this jury's finding of this aggravating circumstance.
Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTEEN
By this assignment of error, defendant contends that imposition of the death penalty in this case is disproportionately excessive. We note that even absent this assignment we would review defendant's sentence of death to determine if it is excessive. The Louisiana statutory scheme requires a capital sentence review. La.C.Cr. P. art. 905.9. Under Louisiana Supreme Court Rule 28 this Court reviews three things:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's findings of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
We have already reviewed and resolved the concerns listed under sub-part (a) in our discussion of defendant's assignments of error numbers 1, 2, 5, 6, 7 and 12; and the concern of sub-part (b) was reviewed under our discussion of assignment of error number 11.[5] Accordingly, we shall turn directly to the issue of whether the sentence in this case is disproportionately excessive.
Since January 1, 1976, juries in Rapides Parish have recommended the death penalty for five defendants: Robert Wayne Felde; Avery "Pete" Moore; Bryan L. Brown; Adam Comeaux; and defendant before the bar. Of these, Comeaux and the instant case involved the rape and murder of elderly white women by young black defendants. This Court did not reach the proportionality issue in Comeaux because it vacated the death sentence for other reasons. State v. Comeaux, 514 So.2d 84 (La.1987). The Court also voided the conviction and death sentence in Brown for reasons not relating to proportionality. State v. Brown, 496 So.2d 261 (La.1986).
Defendant particularly rests his claim of disproportionality upon the fact that Kenneth Prestridge received a life sentence although he raped, beat and hanged his young victim. State v. Prestridge, 507 So.2d 1271 (La.App. 3d Cir.1987). He notes that, since the Prestridge trial and the community outrage with the sentence imposed, no jury in Rapides Parish has recommended a life sentence in a capital murder case. Defendant also compares himself to Prestridge in that both had drug and psychiatric problems and then asserts that "[e]xcept for the popularity of Winthrop Eaton's victim and that Winthrop is black, these cases are factually indistinguishable." The facts in the Prestridge opinion do not refer to that defendant's drug or psychiatric problems. However, they do offer information on a point of substantial distinction between the two cases. Prestridge murdered his victim when she apparently resisted his sexual advances after having met him at a local gameroom and left with him to go riding in his car. Defendant, on the other hand, planned to murder his victim. In fact, in his statement and in Green's testimony, there is a reference to an abortive attempt before the night of the murder. Defendant arrived at the church too late to accomplish his mission because Rev. Joyner had already left. The following night he took care to arrive earlier to be certain she would still be *1212 there. This fact alone may well explain the difference in penalty recommended by the jury. Moreover, apparent disparities in sentencing are an inevitable part of the criminal justice system. McCleskey v. Kemp, ___ U.S. ___, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). A death sentence is not necessarily disproportionate because a defendant in a factually similar case received life imprisonment. State v. Willie, 436 So.2d 553 (La.1983); State v. Taylor, 422 So.2d 109 (La.1982). In fact, co-perpetrators of the same murder do not necessarily receive the same sentence. Compare, State v. Brogdon, 457 So.2d 616 (La. 1984), with State v. Perritt, 430 So.2d 667 (La.1983); State v. Willie, 436 So.2d 553 (La.1983), with State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Sawyer, 422 So.2d 95 (La.1982), with State v. Lane, 414 So.2d 1223 (La.1982).
Comparing defendant's death sentence with those from other parishes indicates that other juries have recommended the death sentence for young men who kill elderly women whether or not they rape them. State v. Kyles, 513 So.2d 265 (La. 1987); State v. Carmouche, 480 So.2d 728 (La.1985); State v. Fuller, 454 So.2d 119 (La.1984); State v. Celestine, 443 So.2d 1091 (La.1983); State v. Flowers, 441 So.2d 707 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983). Nor is it unusual for a jury to recommend the death penalty for a defendant who robs and kills his victim near the victim's home or car. State v. Thompson, 516 So.2d 349 (La.1987); State v. Brown, 514 So.2d 99 (La.1987); State v. Kyles, supra; State v. James, 431 So.2d 399 (La.1983). Moreover, the jury found in this case the aggravating circumstance of aggravated rape of the victim in support of its recommendation of the death penalty.
Defendant moved to exclude evidence of the alleged aggravated rape of the victim and the state's use of this aggravating circumstance to argue in favor of the death penalty. He asserted there was no evidence the victim resisted to the utmost or that she was prevented from resisting. He, however, ignored the portion of the definition of aggravated rape referring to the victim being prevented from resisting the act because the offender is armed with a deadly weapon. La. R.S. 14:42 A(3). Certainly, a pipe heavy enough to fracture the victim's skull is a deadly weapon as is a knife long enough to stab completely through her body.[6] Moreover, the victim clearly could not resist after the defendant rendered her unconscious with blows by the pipe.
Compared with Comeaux from Rapides Parish and compared with a number of cases from other parishes, the death sentence in this case is not disproportionate. Accordingly, this assignment lacks merit.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La. R.S. 15:567 until (a) defendant fails to petition the United States Supreme Court timely for certiorari, (b) that court denies his petition for certiorari, (c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari, or (d) that court denies his application for rehearing.
CONVICTION AND SENTENCE AFFIRMED.
LEMMON, J., concurs, but does not join in the dicta discussing the sufficiency of the "especially heinous" aggravating circumstances.
*1213 See State v. Sawyer, 422 So. 2d 95 (La.1982).
NOTES
[1] Defendant has abandoned three unargued assignments of error. Finding no merit in these three abandoned assignments, we will not discuss them specifically in this opinion.
[2] The victim was unmarried.
[3] Eaton relies on State v. Morris, 245 La. 175, 157 So.2d 728 (La.1963), to support his claim that reversible error resulted from the introduction of the photographs. In Morris, this court held it was reversible error for the trial court to allow the introduction of photographs taken while an autopsy was in progress. The photographs showed the inner portions of the body after it had been cut open and depicted the coroner holding up different organs. The state's avowed purpose for showing the photographs was to demonstrate the victim's organs were healthy and death thus did not result from disease. We pointed out that these photographs were gruesome, ghastly and even revolting. They lacked real evidentiary value as the average layman would not know the difference between a healthy organ and a diseased one. The clearly relevant photographs in this case are quite a far cry from those in the Morris case.
[4] In his brief, defendant makes no mention of either the stab wounds or those inflicted by the pipe.
[5] We note here that the evidence clearly supports the other aggravating circumstances found by the jury, i.e., that the offense was committed while the offender was engaged in the perpetration of an armed robbery and in the perpetration of an aggravated rape. See infra regarding the rape and supra concerning robbery of the auto.
[6] The only real question about the rape might have been whether defendant had intercourse with the victim while she was still alive or whether it occurred after her death. Nevertheless, the definition of rape as intercourse with a "person" who is not the spouse of the offender, committed without that "person's" lawful consent would seem broad enough to encompass both situations. Moreover, in the context of first degree murder, this Court does not distinguish between the armed robbery which occurs before the killing of the victim and the robbery of the victim whom the defendant has already killed. State v. Kirkpatrick, 443 So.2d 546 (La. 1983). In any event, the pathologist's testimony clearly established that the victim was still alive at the time defendant had intercourse with her.