# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 23-793

**STATE OF LOUISIANA**

**VERSUS**

**JAMES DEREK PERSON, II**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2020-860
HONORABLE C. KERRY ANDERSON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**GUY E. BRADBERRY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Jonathan W. Perry, Ledricka J. Thierry, and Guy E. Bradberry, Judges.

**AFFIRMED.**

**James R. Lestage**
**District Attorney**
**Adam M. Bone**
**Assistant District Attorney**
**Richard A. Morton**
**Assistant District Attorney**
**Thirty-Sixth Judicial District**
**124 South Stewart Street**
**DeRidder, LA 70634**
**(337) 463-5578**
**COUNSEL FOR:**
     **State of Louisiana**

**Holli Ann Herrle-Castillo**
**Louisiana Appellate Project**
**P.O. Box 2333**
**Marrero, LA 70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **James Derek Person, II**

**BRADBERRY, Judge.**

On October 29, 2020, a Beauregard Parish grand jury indicted Defendant, James Derek Person, II, with first degree murder, in violation of La.R.S. 14:30(A)(1); criminal conspiracy to commit the first degree murder, in violation of La.R.S. 14:26 and 14:30(A)(1); and obstruction of justice, in violation of La.R.S. 14:130.1(A)(1),(A)(2), and (B)(1).[1]

On July 24, 2023, the State severed the charges of obstruction of justice and criminal conspiracy and amended the first degree murder charge to remove armed robbery. After a two-day trial, on July 28, 2023, a jury unanimously found Defendant guilty of first degree murder.

On August 8, 2020, Defendant subsequently filed a motion for new trial, which the trial court denied with written reasons.

On August 18, 2023, the trial court sentenced Defendant to mandatory life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

Now, Defendant timely files his appeal with this court, assigning two errors:

1. The evidence was insufficient to uphold the conviction for first degree murder.

2. The trial court erred in overruling objections to the State's improper closing rebuttal.

For the reasons stated below, we find Defendant's conviction and sentence should be affirmed.

---

[1]Defendant is referred to by his middle name, Derek, throughout the record.

## FACTS

The facts of the case are fully set forth in the discussion of assignment of error number one, as it concerns the sufficiency of the evidence presented at trial.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant claims the evidence adduced at trial was insufficient to uphold his conviction for first degree murder. Before addressing the merits of Defendant's argument, we will provide the applicable standard of review.

### *Standard of Review*

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with the physical evidence of the case, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied,* 15-1151 (La. 5/13/16), 191 So.3d 1054.

This court has stated the following regarding appellate review in cases relying on circumstantial evidence:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017).

As previously noted, Defendant was convicted of first degree murder. Louisiana Revised Statutes 14:30(A)(1) defines first degree murder as:

[T]he killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . second degree kidnapping[.]

Kidnapping, as defined by La.R.S. 14:44.1(B), is:

(1) The forcible seizing and carrying of any person from one place to another[;]

(2) The enticing or persuading of any person to go from one place to another[;] [or]

(3) The imprisoning or forcible secreting of any person.

The crime becomes a second degree offense when the victim is "[i]mprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon." La.R.S. 14:44.1(A)(5).

*Evidence Adduced at Trial*

During the two-day trial, the jury was presented with physical, photographic, documentary, and testimonial evidence. Jimmie Box, Sr. testified he returned home at 3 a.m. on August 2, 2020, from a fishing competition and noticed his son, victim Jimmie Box, Jr., was not at home.[2] When Jimmie failed to show up the following afternoon, Mr. Box and his wife became concerned because it was unusual for Jimmie to not return home. Mr. Box and his wife eventually reached out to Jimmie's friends, family members, and posted on social media to see if anyone had any information on Jimmie's whereabouts or that of his vehicle, a maroon Toyota 4Runner. The next day, Mr. Box retrieved Jimmie's cell phone records, which indicated the last number Jimmie dialed belonged to Hayley Limes, an acquaintance. According to Mr. Box, Jimmie helped Ms. Limes a few times in the past; however, Ms. Limes was of no assistance in locating Jimmie.

Detective Travis Thompson, an investigator with the Beauregard Parish Sheriff's Office, spoke with Mr. Box regarding Jimmie's disappearance on August 6, 2020. During their conversation, Detective Thompson learned Mr. Box filed a missing person's report with the DeRidder Police Department on August 3, 2020.

---

[2]For clarity, we will address victim Jimmie Box Jr. as "Jimmie" and will address victim's father Jimmie Box Sr. as "Mr. Box."

4

Mr. Box started to receive information regarding Jimmie's vehicle, so Mr. Box gathered a group of people to help search for Jimmie within a 150-mile radius. Eventually, Jimmie's vehicle appeared, so Mr. Box followed the vehicle to a gas station in Moss Bluff, Louisiana, and notified the Calcasieu Parish Sheriff's Office during the pursuit. According to Mr. Box, the cargo rack had been disassembled and a few stickers had been removed, and the driver was identified as Zachary Sylvest. Upon the return of the vehicle, Mr. Box noticed the radio, subwoofer, speakers, and pistol were gone.

Sergeant Cody Fontenot of the Calcasieu Parish Sheriff's Office received a call about a maroon Toyota 4Runner linked to a missing person entering Calcasieu Parish. The digital license plate reading (LPR) system verified the 4Runner as Jimmie's missing vehicle. After learning of the location of the vehicle, Sergeant Fontenot "maneuvered behind it" and followed the vehicle into a convenience store parking lot, known as the "Bronco Stop," in Moss Bluff, Louisiana. Thereafter, Sergeant Fontenot spoke with the driver, Zachary Sylvest, and explained to Mr. Sylvest his reasoning for pursuing the vehicle. Nevertheless, there were no signs of Jimmie. Zachary Sylvest was subsequently arrested after suspected methamphetamine and heroin were found during a search of the vehicle. Mr. Sylvest's phone was also confiscated.

According to Detective Thompson, LPR detected Jimmie's vehicle traveling southbound towards Gillis, Louisiana, at 1 a.m. and then traveling northbound towards Beauregard, Louisiana, at 3 a.m. on August 7, 2020. Later that evening, Detective Thompson received a call about Jimmie's vehicle being stopped at a gas station in Moss Bluff, so he headed to the scene. Once he left, Detective Thompson went to the Calcasieu Parish Sheriff's Office to speak with Zachary Sylvest. After

5

the interview, the Beauregard Parish Sheriff's Office served a search warrant at both 1046 Tom Woodard Road and 1040 Tom Woodard Road, where Defendant and Hayley Limes reside.

During the search of Defendant's and Hayley Limes' homes, officers recovered Mr. Box's subwoofer, swords, firearms, ammunition, and a DVR recording system that was missing its hard drive. Pieces of a dissembled nine-millimeter semi-automatic handgun were also discovered throughout various places in Defendant's home. However, the barrel of the nine-millimeter handgun was not recovered at that time. Detective Thompson identified the recovered handgun as the same handgun depicted in a photograph posted on Defendant's Facebook page from six years ago.

On August 8, 2020, Detective Thompson spoke with Defendant at the Beauregard Parish Sheriff's Office.[3] The interview was audio and video recorded. Before questioning Defendant, Detective Thompson advised Defendant of his *Miranda* rights.[4] According to Detective Thompson, Defendant did not appear to be under the influence at the time.

In the transcript of Defendant's statement, Defendant indicated he and Jimmie were friends who met years ago, while Jimmie was working at Advanced Auto Parts. Defendant admitted he saw Jimmie on Saturday, August 1, 2020, when Jimmie stopped by Hayley Limes' house. However, Defendant stated he was unsure of when Jimmie left. Defendant ultimately denied having any involvement in Jimmie's

---

[3]Although the State introduced the video recording of Defendant's statement into evidence, the thumb drive with the video recording was not submitted with the case file. However, this court was able to retrieve the transcript of Defendant's interview under Defendant's previously filed writ application, 23-329.

[4]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

kidnapping or death and argued his girlfriend, Shona West, made a false statement implicating him due to her excessive medication use. Defendant also stated he had no association with Zachary Sylvest and had not spoken to Mr. Sylvest in "a while."

On August 17, 2020, Detective Thomspon received a call from J.D. Parker, a Louisiana State Police Investigator, in reference to an oil site in Bon Wier, Texas. Detective Thompson, along with a few others, traveled to Bon Wier, wherein they discovered Jimmie's decomposed body. Jimmie appeared to be lying face-down with his hands bound behind his back with black, 550 paracord rope. According to Detective Thompson, Jimmie's hands were bound behind his back during the commission of his death. Jimmie's shoes, a pair of LSU Crocs, were also found next to his body.

Detective Jedediah ("Jed") Irvine of the DeRidder Police Department retrieved surveillance footage from the local gas station Jimmie stopped at before going to Hayley Limes' house. The surveillance footage depicted Jimmie walking into the store on August 1, 2020, at approximately 11 p.m. It is noted that the same shoes found near Jimmie's decomposed body were the same shoes depicted on the surveillance photo.

Detective Irvine conducted a second search of Defendant's home on August 11, 2020, wherein he found the missing barrel, the slide stop, and the case for the firearm. The gun barrel was found in a green, plastic bucket located on the kitchen counter. According to Detective Irvine, the serial number on the firearm matched the serial number on the barrel. Detective Irvine indicated without either the barrel or the slide stop, the weapon could not fire. Detective Irvine could not attest to whether the bucket had been previously searched or whether someone entered the Defendant's home between the first and second search.

7

Paul Nixon, a special agent with the Federal Bureau of Investigations, was assigned to recover the evidence at the Bon Wier scene. During his search for evidence, Agent Nixon found a shell casing as well as bullet fragments underneath Jimmie's remains.

Danny Fernea of the Louisiana State Police Crime Lab conducted a test fire of the nine-millimeter semi-automatic handgun recovered from Defendant's home. According to Mr. Fernea, the handgun arrived disassembled, but none of the pieces were missing. After Mr. Fernea reassembled the handgun, he fired the handgun three times, and then, he submitted the fired rounds, casings, and bullets to another individual in the lab, Chelsee Richardson, for testing. Mr. Fernea did not examine the firearm.

Chelsee Richardson, a firearms examination expert with the Louisiana State Police Crime Lab, tested the nine-millimeter firearm recovered from Defendant's home as well as the fragments and cartridge recovered from the crime scene. Ms. Richardson concluded two of the fragments were pieces of a bullet, but the other fragments were pieces of different metals. Since the two fragments arrived damaged, Ms. Richardson was not able to compare them to the bullets used during the test fire. However, Ms. Richardson was able to compare the nine-millimeter cartridge case recovered from the crime scene to the fired cartridge case collected during the test fire. According to Ms. Richardson's findings, the cartridge retrieved from underneath Jimmie's body was fired from the nine-millimeter handgun recovered from Defendant's home.

Dr. Ginesse Listi, an expert in Forensic Anthropology, performed a trauma analysis of Jimmie's remains. According to Dr. Listi, Jimmie's remains were in an advanced stage of decomposition; there was skeletal exposure and decomposed soft

8

tissues present. Dr. Listi removed the residual tissues and cleaned Jimmie's skeleton before performing the analysis. Dr. Listi's assessment revealed Jimmie's "skull exhibit[ed] trauma consistent with a minimum of one perimortem gunshot wound" in addition to "perimortem trauma in the lower jaw as well as on the cranium." There were also perimortem radiating fractures on the anterior, posterior, and lateral sides of Jimme's cranium due to the impact of the gunshot wound. A small metal fragment was also found in Jimmie's cranium.

Dr. Ami Murphy, an expert in Forensic Pathology, conducted an autopsy on Jimmie's body. Due to the physical state of his remains, Jimmie had not been identified yet; his remains were partially skeletonized with compromised and degraded soft tissues. However, Dr. Murphy used DNA to assist with identifying Jimmie.

During the external examination of Jimmie's remains, Dr. Murphy noticed that Jimmie's "hands were tied behind his back with a black cord." While performing the internal examination, Dr. Murphy found no obvious signs of trauma or natural disease. However, a sample of Jimmie's muscle tissue "tested positive for methamphetamine." Nonetheless, the methamphetamine did not contribute to his death.

Concerning injuries, Dr. Murphy observed a "hole on the bottom part of [Jimmie's] skull, that looked like it could be consistent with a gunshot wound." So, to determine whether the injury was caused by a gunshot wound or another injury, Dr. Murphy obtained a consultation from an anthropologist. The anthropologist's findings confirmed Dr. Murphy's hypothesis. Jimmie sustained a gunshot wound from the back of his head through the front. Ultimately, Dr. Murphy determined

9

Jimmie's cause of death to be "a gunshot wound [to] the head" and Jimmie's manner of death to be a "homicide."

Shona West, Defendant's girlfriend, was also arrested in connection with Jimmie's kidnapping and murder. Ms. West decided to testify at Defendant's trial, so she could receive leniency from the District Attorney's Office and earn mercy from Jimmie's family. Ms. West was not offered anything in exchange for her testimony. Ms. West admitted to making several false statements to law enforcement throughout the course of the investigation to protect herself and Defendant. Nonetheless, Ms. West indicated she was telling the truth during her testimony, which went as follows:

Q      Now, who was with Derek when Jimmie was kidnapped?

A      C.J. Ford and Hayley Limes.

Q      Did the kidnapping start at Hayley's house?

A      Yes, sir.

Q      Had you heard Derek -- had you personally heard Derek describing the kidnapping plan prior to it taking place?

          MR. TILLMAN:

          Objection, Your Honor.

A      (THE WITNESS) Yes, sir.

          . . . .

Q      (MR. JOHNSON) Prior to Jimmie being kidnapped, had you personally heard Derek Person -- sitting right there, describe the plan to kidnap Jimmie?

A      Yes, sir.

Q      Was that plan[ned] to take place at Hayley's house?

A      Yes, sir.

Q      Was Jimmie coming over to Hayley's house?

A      Yes, sir.

Q      Were C.J. Ford and Derek Person waiting in that house armed with firearms?

A      Yes, sir. They were.

Q      Did Derek typically carry a 9mm firearm?

A      Yes, sir.

Q      How did he typically carry it?

A      On his waist.

Q      Was it –

A      On his hip.

Q      Was it in a holster?

A      Yes, sir. In a holster.

Q      I'm [going to] show you a picture, ma'am. This was previously introduced into evidence as State's number 13. Do you recognize this picture?

A      Yes, sir.

Q      What's that a picture of?

A      The handgun on the nightstand.

Q      Okay. Is that Mr. Person's holster?

A      Yes, sir. That is Mr. Person's holster.

Q      That nightstand, is that Mr. Person's side of the bed?

A      Yes, sir.

Q      When Mr. Person was in bed; is that typically where the gun and holster were?

A      Yes, sir.

Q       Did he have that gun and that holster with him before you saw him leave with Jimmie on the night of August [2nd] and when you saw him come back?

A       Yes, sir.

Q       Did you know of any other handguns that Mr. Person would typically carry besides this one that was always in that holster?

A       No, sir.

Q       Do you know roughly how long it was after you saw Jimmie being driven away in C.J. Ford's truck with Derek Person in the truck as well -- before Derek and C.J. Ford came back?

A       It was about forty-five minutes to an hour.

Q       The phone records would be the most objective source of that?

A       Yes, sir.

Q       Did you communicate several times with Derek during the time after which he took Jimmie away?

A       Yes, sir.

Q       Did you communicate with Derek when he was on the drive back –

A       Yes, sir.

Q       -- to your home?

A       Yes, sir.

Q       Did Jimmie ever get back to your home?

A       No, sir.

Q       Did you ever see Jimmie again after that?

A       No, sir.

Q       Were Jimmie and Derek friends?

A       Yes, sir.

Q       Did they maintain contact with each other?

12

A     Yes, sir.

Q     Talk on the phone?

A     Yes, sir. They did.

Q     Text message?

A     Yes, sir.

Q     Did you allow the detectives, during one of your statements to law enforcement, to take your cell phone and give them consent to search it?

A     Yes, sir.

Q     You mentioned a little bit earlier that you had communications with Derek during the drive away and when he was coming back?

A     Yes, sir.

Q     Those communications, those calls, those text messages, they were deleted from your phone before you gave it to law enforcement, right?

A     Yes, sir.

Q     They were?

A     Yes, sir.

Q     So, while these -- while Derek and C.J. Ford were gone, you drove the 4Runner, correct?

A     Yes, sir.

Q     Where -- did you drive it back to your house?

A     Yes, sir.

Q     Where did you park it?

A     In the bamboo.

Q     Did you tell law enforcement that?

A     Yes, sir.

Q     Eventually?

13

A     Yes, sir. Eventually.

Q     Not at first?

A     No, sir.

Q     Did you help Derek to try to get rid of that 4Runner in the days following before it was eventually found?

A     Yes, sir. I did.

Q     Did you contact some of your family members?

A     Yes, sir. I did.

Q     Did you ask them to help get rid of the vehicle?

A     Yes, sir.

Q     Did you arrange for that vehicle, that 4Runner, after you knew Jimmie was gone, to be brought to your family's property?

A     Yes, sir.

Q     You did that?

A     Yes, sir.

Q     Did you tell law enforcement you did that?

A     No, sir.

Q     You lied about that?

A     Yes, sir.

Q     Now, about -- before I move too far along, let me ask you about your lifestyle in the months leading up to this happening; were you using drugs?

A     Yes, sir.

Q     Were you using a lot of drugs?

A     Yes, sir.

Q     Did you -- would you use meth sometimes?

A     Yes, sir. I would.

14

Q      Would you use pills?

A      Yes, sir.

Q      Do you have any prior criminal convictions for having Percocet when you were not supposed to?

A      Yes, sir.

Q      You tried to give law enforcement an excuse about that?

A      Yes, sir. I did.

Q      That was BS, right?

A      Yes, sir.

Q      You had Percocet and you weren't supposed to –

A      Yes, sir.

Q      -- is that true?

A      Yes, sir. It is[.]

Q      Did you continue to have a pill problem after that?

A      Yes, sir.

Q      August the 8th, when sheriff's deputies got to your home, when police officers got to your home that you shared with Derek, you heard them outside; is that right?

A      Yes, sir.

Q      They were asking for you guys to come out for quite a while; is that right?

A      Yes, sir.

Q      What were you doing when they were asking you to come out?

A      I was in the bathroom flushin[g] pills.

Q      Were you and Derek asleep when law enforcement [ ] arrived?

A      No, sir.

Q      What were you doing before law enforcement got there?

15

A    We had intercourse and then we were outside smoking a cigarette.

Q    And you heard law enforcement coming?

A    Yes, sir.

Q    And you went inside?

A    Yes, sir.

Q    And you flushed dope?

A    Yes, sir.

Q    What was Derek doing while y'all were inside and the law enforcement was asking for y'all to come out?

A    Taking apart the gun.

Q    Was he hiding pieces of it?

A    Yes, sir.

Q    Did he try to take apart any other guns or just his handgun?

A    Just his handgun.

Q    The handgun that he keeps in that holster by the bed?

A    Yes, sir.

Q    About six days after you were arrested, you asked to talk with law enforcement again; is that right?

A    Yes, sir.

Q    Were you promised anything to talk with law enforcement?

A    No, sir.

Q    Did you tell [sic] some things that were true and some things that were still maybe a little bit dishonest?

A    Yes, sir.

Q    Did you tell law enforcement about Jimmie's hands being tied behind his back with 550 cord?

16

Q     Yes, sir. I did.

A     Now, that was on August 14th of 2020, correct?

A     Yes, sir.

Q     So, C.J.'s --- I'm sorry, Jimmie's body was found August 17th of 2020, law enforcement would not have known about that yet, right?

A     Correct.

Q     Did you get that information from Derek?

A     Yes, sir.

Q     Once Derek and C.J. returned back to your house -- you know, Jimmie wasn't there, right?

A      No, sir.

Q     Did you know in advance by talking with Derek that there was at least a plan to kidnap Jimmie and bring him to the woods?

A     Yes, sir.

Q     You didn't do anything about that did you?

A     No, sir.

Q     You didn't call the police, did you?

A     No, sir.

Q     Did you communicate while Derek and C.J. had taken Jimmie -- did you communicate with someone named Zach Sylvest?

A     Yes, sir.

Q     Is Zach Sylvest a friend and associate of Derek's?

A     Yes, sir.

Q     Is Zach Sylvest who took that 4Runner from your home?

A     Yes, sir.

Q     Was that pursuant to Derek's request?

A     Yes, sir.

Q     During that kidnapping, you communicated with Zach Sylvest?

A     Yes, sir.

Q     You didn't tell law enforcement that, did you?

A     No, sir.

Q     You know, the phone records -- can't get around `em sometimes; is that right?

A     Yes, sir.

Q     So, was Zach -- seem to be looking for Derek?

A     Yes, sir.

Q     What'd you tell Zach?

A     That he was in the woods.

Q     You respond in text, "He was taking care of some shit," right?

A     Yes, sir.

Q     And then saying, "He didn't tell you?"

A     Yes, sir.

Q     That's what you said to Zach?

A     Yes, sir. That's correct.

Q     And that's while this kidnapping was taking place?

A     Yes, sir.

Q     While Derek was away from your home?

A     Yes, sir.

Q     When Jimmie had left with him?

A     Yes, sir.

Q     During the week -- six and a half days from when Jimmie was kidnapped until law enforcement got to your home, was Derek pretty paranoid during that week?

A    Yes, sir.

Q    Was he keeping up with the developments on social media regarding Jimmie's disappearance?

A    Yes, sir.

Q    Was he angry during that week?

A    Yes, sir.

Q    Are you happy to be here today?

A    Yes, sir.

Q    Are you telling the truth today?

A    Yes, sir.

On cross-examination, Ms. West stated she made multiple false statements to the police because she was scared and wanted to protect Defendant. Ms. West later admitted to not having personal knowledge regarding the events that occurred the night of Jimmie's kidnapping; she received all information from Defendant. However, Ms. West indicated she saw Jimmie in the back seat of the vehicle with Defendant and C.J. Ford prior to them leaving that night.

During the investigation, Samuel Langford, a Ranger with the Texas Department of Public Safety, was contacted about a fugitive by the name of C.J. Ford in his jurisdiction. Upon receiving the arrest warrant, Ranger Langford and the local Marshall's Fugitive Task Force went to a motel in Ingleside, Texas, wherein they found and arrested Mr. Ford. Ranger Langford conducted a search of the motel following Mr. Ford's arrest and retrieved Mr. Ford's cellphone.

J.D. Parker, a former Senior Technical Support Officer with the Louisiana State Police, and an expert in mobile device forensics as well as cellular network and geolocation analysis, was requested to assist in locating Jimmie. Throughout the

investigation, Mr. Parker reviewed Jimmie's, Defendant's, C.J. Ford's, Shona West's, and Zachary Sylvest's cell phone records. According to the records, Jimmie's cellphone stopped communicating with AT&T towers at 1:21 a.m. on August 1, 2020, near Tom Woodard Road.[5] Jimmie's phone was never recovered, and his phone never regained communication with the AT&T network.

Regarding Defendant and C.J. Ford's whereabouts, Mr. Parker stated:

Q       All right. So, what about the other phones? Talk to me about what you saw in the records for Mr. C.J. Ford and Mr. Derek Person.

A       What I saw was that generally in the afternoon of the 1st, C.J. Ford and Derek Person are in and around the area of Tom Woodard Road, I believe it's 1046 Tom Woodard Road.

Q       Just to be super clear, you said afternoon of the 1st?

A       That's correct.

Q       How many hours before Mr. Box's phone turns off?

A       About --

Q       About nine hours?

A       Nine to twelve hours.

Q       All right. Please continue.

A       So, it's over in that area, stays there -- most of the -- doesn't show leaving from that area most of the day. Then, that evening around 7:30ish, 7:45, those two phones, Mr. Box -- I mean, Mr. C.J. Ford and Mr. Derek Person, those two phones travel east -- west down 112, come into town and travel west to Merryville crossing over into Bon Wier.

Q       So, this is actually before Mr. Box goes missing?

A       That's correct.

Q       They travel to the Bon Wier area?

---

[5]We note for clarity that the date would have been August 2, 2020, instead of August 1, 2020, since it was after midnight.

A    That's correct. And this particular part of the day, Mr. Box's phone is geolocating around the area of DeRidder. I believe he's going to be in and around his residence.

Q    So, what happens after Mr. C.J. Ford's phone and Mr. Person's phone goes to that Bon Wier location in the early evening hours? What happens next?

A    They stay there a few minutes, you know, no more than thirty minutes. And then, they travel back and end up back at the Tom Woodard Road area. They stay there 'til a little bit after midnight, and then after, Mr. Box -- Mr. Box leaves town. He'll make a trip to Circle K, and then travel up to the Tom Woodard Road. After Mr. Box gets to the Tom Woodard Road area, C.J. Ford and Derek Person -- both of their phones both geolocate back to Bon Wier. What's different about this trip is this time they don't take 190. They take a road south of 190. They absolutely could not have taken 190 during this trip.

    They go to Bon Wier, and then they come up, you know, they take like Neale Oilfield Road into Merryville. They get back on 190, go into Bon Wier, stay there a few, you know, fifteen to twenty minutes, somewhere right in there, and they go back to the Tom Woodard Road area. Every trip -- the first two trips and the trip going back, those trips are down 190. But the trip when they leave, after Mr. Box gets to the Tom Woodard Road area, they take a different route to the same location.

Q    So, I'll ask you then because I see where you're going. So, what is the significance to you that in the evening hours they take 190 to Bon Wier -- they take 190 back from Bon Wier? And then, right around that 1 o'clock time period, 12:30 a.m. time period, they don't take 190. And then, when they are returning, they take 190. What did you think about that back road deviation?

A    I think that is to avoid detection by law enforcement. Just in case, we don't want to run across any police, and just in case we will take this other route because --

Q    Because why?

A    They have Jimmie Box in the back of the vehicle at that point.

Q    That was your susp[icion]?

A    Yes.

Thereafter, Mr. Parker discussed his methodology on locating Jimmie:

21

Q     All right. And so, knowing that you suspected that they had taken Jimmie Box in the vehicle to the Bon Wier location, where did y'all look for Jimmie Box?

A     We looked in and around the Bon -- now, initially we're looking at cell phone -- the cell phone towers. Like I said, it's not like TV. The cell phone towers -- some of the cell phone towers over there in the Merryville area have an 11 mile -- maybe 11 miles that way and 11-mile-wide area. So, you're talking about an area that's 11 miles by 11 miles, and you have to start looking in there.

      There's no magic, he's right here in this swath on the map. We looked in and around the river, we searched a pond over there in Texas. The sheriff's office was asking me constantly, give me an area to search, I've got guys to go out there and search, give me an area. And a lot of times, I would give them an area, but I just wasn't -- it wasn't a confident area.

            . . . .

Q     So, it sounds like in this case and on this iPhone for Mr. C.J. Ford, that was collected by the Rangers, he had his location services on at the time of this offense?

A     He did.

Q     And so, what were able to see about the locations that his phone automatically stored that you referenced?

A     I saw a couple of locations at Tom Woodard Road from the day from August, you know, August the 1st into August 2nd. And then, I also saw a location in Bon Wier, Texas.

Q     And so, you already kind of knew you were looking at the Bon Wier, Texas area, right? So, was this not just the same information from the phone records?

A     No, this wasn't the same information. Like I said a minute ago, I was not confident or reluctant to give the sheriff's office locations. I couldn't wait to call them to give them this location.

Q     And so, why is that?

A     Because I knew we were about to find Jimmie Box.

Q     And so, talk to me about what happened next, what did you do?

A     I got in my car because I had to go to Alexandria to where the GrayKey was. I got in my car[,] and I started driving back and I called

the sheriff's office and I said, you know, rally them up, I've got us a location to go. And they were like where, I said it's in Bon Wier. You know, by now I've sent them on a couple of wild goose chases, and I said -- I was asked how sure are you? I said, if we need a search warrant, I'll sign the affidavit swearing to it that this is where we need to go. That's how sure I was. I gave them the location. I'm speeding back over here[,] and they tell me they are going to meet me at a little gas station over in Texas. They say they will meet me on the side of the road, we'll wait for [you]. So, I pull up to the gas station and I'm like, there is no way I beat these guys here. I call them, and they said they are already on their way down 4075, which is a county road over in Bon Wier. I was like, y'all didn't wait on me. So, I headed on down the road, I wasn't [at] the location yet and they called me and said, we found him.

Thereafter, Mr. Parker discussed the communication frequency between Jimmie, Defendant, and Hayley Limes. According to Mr. Parker, Jimmie and Defendant had "nearly twelve hundred communications," which consisted of text messages and voice calls, prior to the night of Jimmie's disappearance. Jimmie also had "208" messages and "33 voice calls" with Hayley Limes. Jimmie's records indicated he communicated with both Defendant and Hayley Limes until the day of the crime.

Mr. Parker also provided a visual demonstration of the whereabouts of Defendant, C.J. Ford, and Shona West on the night of Jimmie's disappearance pursuant to their phone data. According to Mr. Parker, Defendant, C.J. Ford, and Shona West were all on Tom Woodard Road around midnight. Then, after Jimmie arrived at Tom Woodard Road, Defendant and C.J. Ford traveled to Bon Wier, TX, near the crime scene.

*Arguments in Brief*

In brief, Defendant argues the State failed to present sufficient evidence to uphold his first degree murder conviction. Specifically, Defendant claims the State failed to prove that he kidnapped victim Jimmie Box, Jr. and/or that the kidnapping occurred in Louisiana. According to Defendant, there was no direct evidence of a

23

kidnapping, and the State solely relied on the conflicting testimony of co-defendant, Shona West. Defendant contends Ms. West did not observe any actions that remotely resembled a kidnapping, as Ms. West could not testify that Defendant held Jimmie at gunpoint or forced Jimmie to get inside of the vehicle. Moreover, Defendant asserts Ms. West was "an untrustworthy witness," who suffers from a drug addiction and "mental health issues." Nevertheless, Defendant argues the State failed to prove that a first degree murder occurred in Louisiana. As such, Defendant insists the State failed to present sufficient evidence of a first degree murder. Therefore, Defendant claims his conviction should be vacated.

On the contrary, the State argues the evidence introduced at trial was sufficient to sustain Defendant's conviction for first degree murder. According to the State, the evidence presented at trial was "overwhelming against" Defendant and that the elements of first degree murder were proven beyond a reasonable doubt. The State additionally notes that Defendant argues against the credibility of co-defendant, Shona West. Nonetheless, the State asserts that "the credibility of the witnesses and the weight of the evidence submitted fall solely to the jurors to determine, and the appellate courts are not permitted to second-guess the jurors['] judgments as to those matters." As such, the State contends the evidence adduced at trial was more than sufficient "to support the jury's guilty verdict."

*Jurisprudence and Analysis*

A rational trier of fact, viewing the evidence in the light most favorable to the State, could have reasonably found Defendant guilty beyond a reasonable doubt of first degree murder. The State's witness, co-defendant Shona West, testified she saw Jimmie, Defendant, and C.J. Ford in the vehicle together on the night of Jimmie's disappearance. The State also presented evidence that demonstrated

24

Defendant as the owner and possessor of the firearm used to kill Jimmie. The documentary and testimonial evidence of digital forensic expert, J.D. Parker, placed Defendant at the crime scene twice on the night of Jimmie's disappearance. The State's evidence also revealed that Jimmie's hands were bound behind his back during the commission of his death. Lastly, Ms. West testified Defendant informed her of the plan to kidnap Jimmie at Hayley Limes' house and then kill Jimmie in the woods. Although Ms. West made inconsistent statements throughout the investigation, it is the fact finder's role to weigh the respective credibility of the witnesses, and the reviewing court will not second-guess the credibility determinations of the fact finder beyond the sufficiency evaluations under the *Jackson* standard of review. *State v. Richardson,* 425 So.2d 1228 (La.1983).

We find the conviction is also supported by this court's decision in *State v. Senegal*, 14-1163 (La.App. 3 Cir. 3/4/15) (unpublished opinion) (2015 WL 914705), *writ denied*, 15-686 (La. 2/26/16), 187 So.3d 469. In *Senegal*, the defendant was unanimously found guilty of two counts of first degree murder, one count of second degree kidnapping, and two counts of obstruction of justice. The defendant appealed, arguing the evidence presented at trial was insufficient to support his convictions due to the inconsistent statements made by Amanda Lebon, Kim Hanks, and Hahn Hanks, the prosecution's witnesses. Ms. Lebon testified the defendant asked her to drive to Kim Hanks' home to question the victim regarding the slashing of the defendant's tires. Ms. Lebon stated once they arrived at Ms. Hanks' home, the defendant got out of the vehicle, knocked on the door, and went inside of Ms. Hanks' home. According to Ms. Lebon, Kim Hanks answered the door; however, both Kim Hanks and Hahn Hanks denied answering the door for defendant. Ms. Lebon stated she stayed inside of the vehicle because her children were also in the vehicle.

25

Afterwards, Ms. Lebon testified she saw the defendant arguing with someone and appeared to have a gun in his hand. Shortly thereafter, Ms. Lebon heard two gunshots and saw the defendant run off the porch; she was unsure whether the defendant murdered anyone. As she was scared for her and her children's safety, she allowed the defendant to get back into the vehicle before leaving the Hanks' residence. Kim Hanks testified she saw the defendant drive away from the scene; however, she did not see anyone else in the vehicle with him. All three witnesses identified the defendant as the shooter. In affirming the defendant's convictions, this court stated:

> In his argument regarding the insufficiency of the evidence to prove the murders, the Defendant points to internal inconsistencies in Amanda Lebon's testimony as well as inconsistencies between her testimony and the testimony of the Hanks sisters. Specifically, he notes that Amanda testified she was good friends with Gary, but then testified that she tried to persuade the Defendant to stay away from Gary and his friends. He then focuses on Amanda's testimony that the Defendant exited and re-entered the passenger door of the car at the Hanks' house whereas Hahn Hanks testified when she looked out[,] she saw the driver door shutting and Kim Hanks testified she did not see anyone get back into the car and she could not see anyone else in the car. Finally, the Defendant notes the differing testimony as to whether Kim Hanks answered the door when the Defendant arrived at the Hanks' residence.
>
> The supreme court has discussed the standard for reviewing sufficiency of the evidence claims:
>
> > The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall,* 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman,* 95–0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review.

> *State v. Bordenave,* 95–2328 (La.4/26/96), 678 So.2d 19,
> 20. It is not the function of an appellate court to assess
> credibility or re-weigh the evidence. *Id.*

*State v. Macon,* 06–481, pp. 7–8 (La.6/1/07), 957 So.2d 1280, 1285–86.

> Louisiana courts have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility. . . ." *Id.* at 1286. "The actual trier of fact's *rational* credibility calls . . . are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution. . . ." *Mussall,* 523 So.2d at 1311 (citing *Jackson,* 443 U.S. 307, 99 S.Ct. 2781). "[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* at 1310 (citing *Jackson,* 443 U.S. 307, 99 S.Ct. 2781). "In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec,* 99–633, pp. 4–5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.

*State v. H.L.J.,* 08–1070, p. 16 (La.App. 3 Cir. 4/1/09), 6 So.3d 997, 1006–07.

> The inconsistencies in testimony pointed out by the Defense in this assignment of error are a matter of credibility, which is in the purview of the fact finder. The jury's verdict indicates it viewed any inconsistency in the witnesses' testimonies as insignificant to their overall credibility. We will not disturb the credibility determination made by the jury. The Defendant's claim has no merit.

*Id.* at 8–10 (second alteration in original).

Considering the jurisprudence and a thorough review of the record, we find the evidence presented, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, the elements of first degree murder.

Accordingly, the evidence was sufficient to support Defendant's first degree murder conviction and this assignment of error is without merit.

# ASSIGNMENT OF ERROR NUMBER TWO

### *Prosecution's Improper Statements*

In his second assignment of error, Defendant contends the trial court erred in overruling the defense's objections to the State's improper closing rebuttal statements.

The following colloquy occurred during the State's rebuttal closing argument:

MR. JOHNSON:
     You know, no matter how long I do this, no matter how many murder cases I try, every time I'm still flabbergasted what some defense lawyers are willing to look you in the eye and tell you with a straight face. I sat there flabbergasted as Mr. Tillman just called something hearsay that he knows the legal definition of, that's not hearsay, and that's his client's own statements. He knows that the law explicitly says that's not hearsay. But he injects that word to you because he knows you don't know better than that unless the Judge reads it to you, hoping that you decide it's unreliable. . . .

          . . . .

     You know, there [were] complaint[s] -- a lot about Hayley. Now, I'm not a fan of Hayley, she's not [on] trial. But what one cannot do is call a co-defendant and then -- so, you know they can call a co-defendant [be]cause they did this morning. But then complain about you not hearing from another co-defendant. Let that process in your minds. Let that process in your minds.

     The defense called a co-defendant, so you saw it was possible. They don't have to do it, but you can keep that credibility in mind about the whining about you not hearing from any other co-defendant.

MR. TILLMAN:
     May we approach?

THE COURT:
     Mr. Johnson, approach.

**(BENCH CONFERENCE)**

MR. TILLMAN:
     That's clearly a misstatement of law [be]cause obviously I cannot call a co-defendant. I can't -- I don't have the privilege of giv[ing] immunity, you do.

MR. ROBINSON:
> We already did.

MR. JOHNSON:
> (UNINTELLIGIBLE)

MR. ROBINSON:
> It's done. She (UNINTELLIGIBLE)

MR. TILLMAN:
> (UNINTELLIGIBLE) co-defendants. You're talking about me calling the co-defendants.

MR. ROBINSON:
> Right. (UNINTELLIGIBLE)

MR. TILLMAN:
> I can't do that.

MR. ROBINSON:
> (UNINTELLIGIBLE) then you have the right to call her.

MR. JOHNSON:
> You can call her as long you don't use what she says --

MR. TILLMAN:
> I don't get to use it, you do.

MR. ROBINSON:
> (UNINTELLIGIBLE)

MR. JOHNSON:
> You're free to call her.

MR. ROBINSON:
> Yeah. She's given -- she's been granted immunity. (UNINTELLIGIIBLE) an order compelling her testimony. (UNINTELLIGIBLE DUE TO TALKING SIMULTANEOUSLY)

MR. JOHNSON:
> (UNINTELLIGIBLE) for Hayley too.

MR. TILLMAN:
> There was a (UNINTELLIGIBLE) though.

THE COURT:
> We [sic] straighten it out.

**(BENCH CONFERENCE CONCLUDED)**

MR. JOHNSON:

. . . .

The good thing about evidence in this country is the defense doesn't have to do anything at all and he's right. But that evidence -- those rounds are in that box[,] and they're kept. And they're kept so that anybody who disagrees with their conclusions can retest them. Anyone, if they want, can test those rounds. If they think that they weren't fired from that gun, they can test those rounds and bring in someone to the affect.

MR. TILLMAN:
Your Honor, may we approach?

THE COURT:
Approach.

**(BENCH CONFERENCE)**

MR. TILLMAN:
I'm sorry to do that but that's again saying we have to call (UNINTELLIGIBLE).

MR. JOHNSON:
(UNINTELLIGIBLE)

MR. TILLMAN:
We don't have to present evidence.

THE COURT:
He's not saying you have to present it[,] but you have the right to examine those rounds, hire your own expert, have them test[ed] it if you wanted to. There's nothing wrong about the statement that he made. He didn't say you had to, he said you could.

MR. TILLMAN:
I don't know if that's (UNINTELLIGIBLE).

(UNINTELLIGIBLE DUE TO TALKING SIMULTANEOUSLY)

MR. JOHNSON:
It's a significant difference. (UNINTELLIGIBLE)

THE COURT:
He never said anything about the (UNINTELLIGIBLE) --

MR. TILLMAN:

      It doesn't say we should've done it. He said we should've presented a defense is what he's saying. But we could've called these people and should've done this.

THE COURT:

      The second part of that is exactly what he said, is that you could have tested the rounds, which I think is an allowable statement. He didn't say that you had to.

MR. TILLMAN:

      I mean, that -- to me, it flies in the face[,] and we don't have to do anything, but (UNINTELLIGIBLE) [ ] I would object to that.

THE COURT:

      So noted.

MR. TILLMAN:

      Note our objection.

*Arguments in Brief*

In brief, Defendant argues the trial court erred in overruling the improper comments made by the State during its closing rebuttal argument. Defendant contends the State misstated the law and made personal comments about defense counsel, as an attempt to "convince the jury that trial counsel was a liar." According to Defendant, the statements were inappropriate and inaccurate, which ultimately influenced the jury and contributed to the verdict. Therefore, Defendant claims the trial court erred in overruling the defense's objections.

To the contrary, the State contends Defendant's arguments are "moot" and that "it is not probable that a jury was so influenced by these tactics or argument that it persuaded them or contributed to the verdict." According to the State, the evidence solely led the jury to believe that Defendant was guilty of first degree murder, and as such, its rebuttal was not inappropriate.

31

*Jurisprudence and Analysis*

Louisiana Code of Criminal Procedure Article 774 provides the following regarding the scope of the State's closing argument:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
>
> The argument shall not appeal to prejudice.
>
> The state's rebuttal shall be confined to answering the argument of the defendant.

Moreover, La.Code Crim.P. art. 771 provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

In *State v. Prince*, 16-260 (La.App. 3 Cir. 2/1/17), 211 So.3d 481, *writ denied*, 17-410 (La. 11/28/17), 230 So.3d 222, *writ denied*, 17-667 (La. 2/23/18), 237 So.3d 1190, *cert. denied*, __ U.S. __, 139 S.Ct. 102 (2018), this court ruled on a similar issue regarding a comment made by the State. During its opening statement, the State said "[a]s humans evil is among us every day in a different shape[.]" *Id.* at 495. Shortly thereafter, the defense objected to the comment, arguing that it was improper argument. The trial court subsequently overruled the objection. On

appeal, the defendant claimed the trial court erred by overruling its objection, as the comments made by the State were not within the scope of La.Code Crim.P. arts. 766 and 774. Affirming, this court stated the following:

> The supreme court has explained:
>
> > Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. *State v. Eaton*, 524 So.2d 1194, 1208 (1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); *State v. Barrow*, 410 So.2d 1070, 1075 (La.), *cert. denied*, 459 U.S. 852, 103 S.Ct. 115, 74 L.Ed.2d 101 (1982); *State v. Prestridge*, 399 So.2d 564 (La.1981). However, before this court will reverse on the basis of improper argument it must be thoroughly convinced the jury was influenced by the remarks and such contributed to the verdict. *Eaton, supra.* "In making this determination, the court gives credit to the good sense and fairmindedness of the jury." *Eaton*, 524 So.2d at 1208. *See also Taylor*, 93–2201 at p. 21, 669 So.2d at 375. *State v. Williams*, 96–1023, p. 15 (La. 1/21/98), 708 So.2d 703, *opinion corrected* (La. 5/28/98), 708 So.2d 703, 716, *cert. denied*, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998).
>
> Defendant appears to acknowledge that the remarks at issue are subject to a harmless error analysis.
>
> . . . .
>
> While Defendant objected to the remarks at issue, he did not request a mistrial. As mentioned earlier, Defendant renewed his objection after the opening. The trial court stated that it would advise the jury not to be moved by emotion and ultimately gave such an instruction. Thus, we find the dictates of La.Code Crim.P. art. 771 were satisfied.
>
> We also find there is little likelihood the remarks influenced the jury and contributed to the verdict. Pursuant to *Williams*, we find that the possible influence of the remarks does not rise to the level of thoroughly convincing this court that they improperly influenced the verdict. As discussed in the previous assignment of error, the core of the case was the credibility of Michael Hayes, whose testimony was corroborated by other evidence at trial and obviously believed by the jury. The State's appeal to the general idea of evil did not clearly have a bearing on the credibility issue. Also, a true contemplation of general evil might just as easily have led the jury to doubt Hayes. It is clear he is not a "model citizen," and the district court allowed Defendant to

explore the issue of whether Hayes was merely trying to save his own neck at Defendant's expense.

For the reasons discussed, this assignment lacks merit.

*Id.* at 497–99.

We note, as in *Prince*, Defendant objected to the comments made by the State but failed to request a mistrial. It is noted the trial court informed the jury that the statements made by counsel were not evidence and instructed the jury to disregard any information that was not presented in evidence. Considering jurisprudence and a thorough review of the record, we find that the State's comments had no influence on the jury, as the State presented sufficient evidence to prove that Defendant was guilty beyond a reasonable doubt of first degree murder.

Accordingly, this assignment of error is without merit.

## CONCLUSION

Defendant's conviction and sentence is affirmed.

**AFFIRMED.**

34